STATE OF NORTH CAROLINA v. PATRICK JOSEPH STEEN

No. 530A98

(Filed 13 July 2000)

## 1. Appeal and Error— findings of fact—support by evidence—general contention

The North Carolina Supreme Court would not review a trial court's findings of fact in the denial of a motion to suppress where defendant made only a general contention that the findings were not supported by the evidence.

## 2. Search and Seizure— investigatory stop—erratic bicycle riding

Observation of the manner and place in which defendant was riding his bicycle was sufficient to raise a reasonable suspicion for an investigatory stop where the officers observed defendant weaving in heavy traffic, so that his operation of the bicycle constituted a traffic offense. Additionally, defendant agreed to speak with the officers when they pulled him over.

## 3. Search and Seizure— consent—voluntary

The trial court in a first-degree murder prosecution properly determined that defendant's consent to a search following a traffic stop was voluntary where the court found that defendant had had experience with the criminal justice system, agreed to speak with the officers, the officers noticed an odor of alcohol about defendant and that his eyes appeared dilated, the officers asked if they could search defendant and he agreed, and one of the officers noticed blood spots on defendant's shirt and person.

STATE v. STEEN

[352 N.C. 227 (2000)]

### 4. Search and Seizure— clothing—following arrest

A search of a first-degree murder defendant's clothing was not unconstitutional or otherwise unlawful where he was arrested for possession of drug paraphernalia and stolen credit cards, his clothing was taken and a jumpsuit issued on his arrival at the jail, he became the focus of a murder investigation while he was in jail, an officer told him that he was a suspect in an armed robbery investigation and defendant gave consent for his clothes to be examined, and blood and glass particles were found. Defendant was in custody and the effects in his possession could be searched without a warrant; his consent is irrelevant. Furthermore, he had previously consented to a search of his person, which included his clothing, the glass did not compare with the glass at the victim's home, and the blood was defendant's rather than the victim's.

### 5. Confessions and Incriminating Statements— statements— voluntary—not incriminating—not admitted

The trial court in a first-degree murder prosecution properly determined that defendant's statements to the police were voluntary and not in violation of Miranda where defendant acknowledged in his brief that none of his statements were admitted into evidence, the trial court found that no incriminating statement was made, a review of the record by the Supreme Court did not reveal the slightest hint of coercion or police impropriety, and defendant was given his Miranda rights when he was first placed in custody.

### 6. Search and Seizure— hair and saliva samples—six hours after arrest

The trial court did not err in a first-degree murder prosecution by concluding that neither a court order nor a search warrant was necessary for the police to take hair and saliva samples from defendant six hours after he was taken into custody. There is no indication of intervening events which broke the continuity between defendant's arrest and the collection of the samples; furthermore, taking hair and saliva samples as long as one day following arrest has been approved on the basis of being in police custody rather than on the basis of the taking being incident to arrest.

**7. Search and Seizure— statements in warrant application— good faith**

The trial court did not err in a first-degree murder prosecution by concluding that officers who had applied for a search warrant had acted in good faith where defendant contended that information in the application was false.

**8. Jury— selection—capital trial—death penalty questions**

The trial court did not abuse its discretion during jury selection for a capital first-degree murder prosecution by permitting the prosecutor to make statements and ask questions which barely mentioned mitigating circumstances. The record reflects that the purpose of the questions was to determine whether a prospective juror had the ability to vote for the death penalty and, even if the prosecutor minimized the role of mitigating circumstances, defendant explained the significance of mitigating circumstances during voir dire and the court cured any adverse effect from the prosecutor's questions in the instructions at the conclusion of the penalty phase.

**9. Jury— selection—capital sentencing process—requested instructions**

The trial court did not abuse its discretion during jury selection for a capital first-degree murder prosecution by denying defendant's requested instructions on the capital sentencing process and giving an instruction essentially in accordance with North Carolina's pattern jury instructions.

**10. Jury— selection—capital trial—individual voir dire—juror sequestration**

The trial court did not abuse its discretion in a capital first-degree murder prosecution by refusing to allow individual voir dire and juror sequestration.

**11. Jury— selection—capital trial—rehabilitation**

The trial court did not abuse its discretion in a capital prosecution for first-degree murder by denying defendant's motion for rehabilitation of each juror challenged for cause where the court stated that further questions would be allowed on a juror-by-juror basis if there was some equivocation in the responses.

**STATE v. STEEN**

[352 N.C. 227 (2000)]

## 12. Appeal and Error— preservation of issues—failure to object

A capital first-degree murder defendant did not preserve for appellate review the issue of whether the trial court sufficiently inquired into an alleged improper contact between a juror and a third party where defense counsel's ultimate request was for the court to select two more alternate jurors and to instruct all of the jurors not to discuss the case with anyone. There was no indication that defendant objected to the trial court's response or requested that the court inquire into the matter further.

## 13. Appeal and Error— plain error rule—issues within trial court's discretion

The plain error rule has not been and is not applied to issues which fall within the trial court's discretion. N.C. R. App. P.10(b)(2).

## 14. Sentencing— capital—mitigating circumstances—defendant's age

The trial court did not err in a capital sentencing proceeding by not submitting the mitigating circumstance of defendant's age, N.C.G.S. § 15A-2000(f)(7), where defendant had suffered a head injury which caused organic brain damage, borderline mental retardation, and severe memory impairment; he was 26 at the time of the murder; he was gainfully employed and able to perform his job duties proficiently; he functioned adequately in society; and there was substantial evidence that he had the mental capacity to premeditate and plan his crime.

## 15. Sentencing— capital—mitigating circumstances—peremptory instructions

The trial court did not err during a capital sentencing proceeding by denying defendant's request for peremptory instructions on the mitigating circumstances of mental or emotional disturbance, N.C.G.S. § 15A-2000(f)(2), and impaired capacity to appreciate the criminality of conduct, N.C.G.S. § 15A-2000(f)(6). Defendant's evidence of the statutory circumstances was controverted and, even though the court determined that there was sufficient evidence to warrant a peremptory instruction on the nonstatutory mitigating circumstances that defendant's brain injury affected his ability to function on a daily basis and affected his personality, the focus of the mitigating circumstances differed.

STATE v. STEEN

[352 N.C. 227 (2000)]

**16. Appeal and Error— denial of peremptory instructions—no assessment of evidence—issue abandoned**

An assignment of error to the trial court's denial of defendant's requested peremptory instruction on certain nonstatutory mitigating circumstances in a capital sentencing proceeding was deemed abandoned where defendant merely referred the Supreme Court to the statement of facts in his brief and did not assess the evidence as to each of the asserted circumstances or point out the evidence he believes is uncontroverted and manifestly credible.

**17. Sentencing— capital—instructions—statutory and nonstatutory mitigating circumstances**

The trial court did not err in a capital sentencing proceeding in its instructions on capital and noncapital mitigating circumstances where the instructions were consistent with the pattern jury instructions. Although defendant argued that repeating the nonstatutory instruction nineteen times could lead a reasonable juror to apply that instruction to both nonstatutory and statutory mitigating circumstances, the number of times a jury is instructed on nonstatutory mitigating circumstances necessarily parallels the number of nonstatutory circumstances requested and submitted.

**18. Sentencing— capital—instructions—neutral phrasing**

The trial court did not err in a capital sentencing proceeding by giving an instruction on mitigating circumstances with a neutral, conditional phrase beginning with "whether," rather than the declarative contention requested by defendant, to which jurors could have indicated their agreement with a "yes" or "no." The court instructed the jury in accordance with the pattern jury instructions, the jurors understood that the questions called for a yes or no answer, and they answered accordingly.

**19. Sentencing— capital—instructions—nonstatutory mitigating circumstance—circumstance found—no plain error**

There was no plain error in a capital sentencing proceeding where defendant contended that the court's instruction on a nonstatutory mitigating circumstance was confusing, but at least one juror found the circumstance to exist and to have value.

**20. Sentencing— capital—instructions—mitigating circumstances—unanimity**

A trial court's instruction in a capital sentencing proceeding requiring unanimity in finding mitigating circumstances was merely a lapsus linguae. It is clear from a review of its other instructions that the court understood that the law does not require the jury to find mitigating circumstances unanimously, and the instructions overall made it clear that each juror could find any mitigating circumstance and that unanimity is not required.

**21. Jury— selection—capital trial—parole—questioning of prospective jurors**

The trial court did not err in a capital first-degree murder trial by denying defendant's request to question prospective jurors on their understanding of parole eligibility. N.C.G.S. § 15A-2002 does not apply to the jury selection process.

**22. Sentencing— capital—parole—instructions on changes in the law**

The trial court did not err in a capital sentencing proceeding by refusing to instruct jurors on changes in the law regarding parole. The jury was repeatedly and clearly instructed that defendant would either receive a sentence of death or life imprisonment without parole.

**23. Sentencing— capital—instructions—parole—pattern jury instructions**

Although the better practice would be to charge the jury using the precise language found in N.C.G.S. § 15A-2002, the trial court did not err in a capital sentencing proceeding by reading from the pattern jury instructions on parole eligibility.

**24. Criminal Law— defendant's argument—capital sentencing—life without parole**

The trial court did not abuse its discretion in a capital sentencing proceeding by not allowing defendant to argue to the jury changes in the parole laws and that there would be no parole in this case. Defendant was, in fact, permitted to argue that defendant should be sentenced to life imprisonment without parole and the jury was clearly made aware that life imprisonment meant life imprisonment without parole.

STATE v. STEEN

[352 N.C. 227 (2000)]

### 25. Criminal Law— prosecutor's argument—capital sentencing—future dangerousness

The trial court did not abuse its discretion during a capital sentencing proceeding by allowing the prosecutor to argue future dangerousness; even though parole has been eliminated in capital cases, it is permissible to argue the possibility of future dangerousness to prison staff and inmates.

### 26. Criminal Law— prosecutor's argument—capital sentencing—escape

The trial court did not abuse its discretion in a capital sentencing proceeding by denying a mistrial after giving a curative instruction to the prosecutor's argument that defendant might escape from prison. Defendant failed to show that the curative instruction was insufficient to erase any potential prejudice.

### 27. Criminal Law— prosecutor's argument—grand jury indictment

There was no plain error in a capital sentencing proceeding in the prosecutor's argument concerning a changed date on the grand jury indictment. The argument was proper to refute defendant's attack on the procedure used in charging defendant and the instruction that being charged or indicted was not evidence of guilt was sufficient to eliminate any confusion or false impression the jury might have had.

### 28. Sentencing— capital—death sentence—not arbitrary

The record fully supported the aggravating circumstances found by the jury in a capital sentencing proceeding and there was no indication that the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor.

### 29. Sentencing— capital—death penalty not disproportionate

A sentence of death for a first-degree murder was not disproportionate where defendant was convicted of a premeditated and deliberate murder committed in the victim's home, the jury found the especially heinous, atrocious or cruel aggravating circumstance, and the case was more similar to cases in which the sentence of death was found proportionate than to those in which it was found disproportionate. Based upon the entire record, the sentence was not excessive or disproportionate.

Appeal as of right by defendant pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of death entered by Downs, J., on 28 August 1998 in Superior Court, Mecklenburg County, upon a jury verdict finding defendant guilty of first-degree murder. Defendant's motion to bypass the Court of Appeals as to additional judgments was allowed by the Supreme Court on 31 August 1999. Heard in the Supreme Court 17 April 2000.

*Michael F. Easley, Attorney General, by William B. Crumpler and Robert C. Montgomery, Assistant Attorneys General, for the State.*

*Paul M. Green for defendant-appellant.*

LAKE, Justice.

On 12 January 1998, defendant was indicted for first-degree murder and for felonious breaking and entering and common law robbery as a habitual felon. On 16 March 1998, he was also indicted for first-degree rape. Defendant was tried capitally to a jury at the 20 July 1998 Mixed Session of Superior Court, Mecklenburg County. Prior to the jury's consideration of the charges, the first-degree rape charge was reduced to attempted first-degree rape. On 21 August 1998, the jury found defendant guilty of first-degree murder on the basis of premeditation and deliberation and under the felony murder rule. The jury also found defendant guilty of felonious breaking and entering and common law robbery, but the jury found defendant not guilty of attempted first-degree rape. Following a capital sentencing proceeding, the jury recommended a sentence of death for the first-degree murder conviction. The jury also found defendant guilty of being an habitual felon upon both the breaking and entering and robbery convictions. On 28 August 1998, the trial court sentenced defendant to death. The trial court also sentenced defendant to consecutive sentences of 145 to 183 months' imprisonment for the breaking and entering conviction and 145 to 183 months' imprisonment for the common law robbery conviction. Defendant appeals his conviction for first-degree murder and his sentence of death to this Court as of right. On 31 August 1999, this Court allowed defendant's motion to bypass the Court of Appeals as to his appeal of the remaining convictions.

At trial, the State's evidence tended to show that on 29 February 1996, shortly before 4:00 p.m., Officer Gordon Ogilvie of the Charlotte-Mecklenburg Police Department responded to a report of a

broken window at 2626 Tanglewood Lane. The victim, eighty-year-old Virginia Frost, had resided at the residence for forty years. When Officer Ogilvie arrived at Mrs. Frost's residence, a neighbor, Susan Bankson, met him. She explained that her children had been playing in Mrs. Frost's yard and found some broken glass. Ms. Bankson went to Mrs. Frost's house and saw that the glass door leading to the sun-room was shattered. Ms. Bankson called Mrs. Frost's daughter, Ann Copeland, and also the police.

Officer Richard Stahnke also arrived at the scene. The officers entered the victim's house to determine if a break-in had occurred. Once inside, the officers noticed that the house appeared to have been ransacked. The officers then observed the lifeless body of Virginia Frost lying in a bathroom. Mrs. Frost was nude except for a shirt pulled up around her neck. The officers also observed what appeared to be dried blood on Mrs. Frost's face and on one of her hands. There was a pool of blood around her head, and there appeared to be an indentation on her head as though she had been struck with some object. A pair of pantyhose was underneath Mrs. Frost's body.

An autopsy performed on 1 March 1996 revealed contusions over the bridge of the victim's nose, around her left eye and over the left side of her cheek; a laceration on the right side of her scalp; bruising over her head, neck, left arm, shoulder, chest and buttocks; and a broken tooth. The autopsy also revealed areas of hemorrhage around the brain, swelling and bruising of the brain, sixteen separate fractures to ten different ribs, and small tears in the inner lining of the chest. The autopsy report described the head injuries as blunt-trauma injuries caused when the body was impacted by something blunt. The report also stated that none of the blows would have been immediately fatal, and that Mrs. Frost would have survived for three to four hours. The cause of Mrs. Frost's death was determined to be blunt-trauma injuries to her head due to an assault.

On the same day that the police discovered Mrs. Frost's body, Officers A.J. Mullis and P.M. Ensminger of the Charlotte-Mecklenburg Police Department responded to a call concerning a man on a bicycle weaving on Randolph Road, which is less than two miles from the victim's residence. The officers discovered the defendant, Patrick Joseph Steen, on a bicycle on the roadway, weaving back and forth through heavy traffic. The officers pulled defendant over on the side of the road and observed a large contusion running across defendant's forehead and what appeared to be dried blood on his left cheek.

The officers also noticed an odor of alcohol about defendant. After obtaining consent to search defendant, the officers found a driver's license issued to a William H. Maynard and numerous credit cards with the same name. The officers also found a crack pipe and a marijuana pipe on defendant's person. The officers arrested defendant for possession of drug paraphernalia and theft of the credit cards. Officer Mullis subsequently sent information about defendant to a homicide investigator looking into the murder of Mrs. Frost.

On 6 March 1996, defendant gave written consent for the search of the clothes he was wearing when he was arrested. Defendant was released from custody on 14 March 1996. On 16 March 1996, two of the murder investigators went to his home and asked defendant to accompany them to the Law Enforcement Center. Defendant was told he was not under arrest and was questioned about his whereabouts from 26 February to 29 February 1996. Defendant was subsequently placed under arrest for Mrs. Frost's murder and was advised of his *Miranda* rights.

At trial, Henrietta Doster, an acquaintance of defendant's, testified that in late February 1996, defendant showed her and her boyfriend, Charlie Davis, a small red television. Defendant also emptied the contents of a small blue tote bag which contained coins, buttons and a lady's wallet. Doster looked at the wallet and saw an elderly lady's driver's license with the name "Virginia" on it. Davis gave defendant thirty dollars for the television.

Ann Copeland testified that on 10 March 1996, she was allowed to enter her mother's residence. She noticed that a small red television that she had given her mother was missing from the kitchen. Ann Copeland identified the red television collected from Charlie Davis as the one she had given her mother. Mrs. Copeland also identified pieces of silverware collected from Davis as belonging to her mother.

In his first assignment of error, defendant contends that the trial court erred in denying defendant's motion to suppress evidence. Prior to trial, defendant filed a motion to suppress several categories of evidence. Defendant subsequently filed an amendment to that motion. From 20 July 1998 to 24 July 1998, the trial court conducted a suppression hearing on defendant's motion and the amendment. During jury selection on 31 July 1998, the trial court ruled that the "motion to suppress is denied in each and every respect." On 28 August 1998, the trial court stated its findings and conclusions in sup-

port of its denial of defendant's motion to suppress. Because defendant challenges on various grounds the trial court's rulings for several separate categories of evidence under this single assignment of error, we will separately address the trial court's findings and conclusions for each individual category of evidence.

As a preliminary matter, we note that this Court has long held that the following rules apply when reviewing a trial court's ruling on a motion to suppress evidence:

> When the competency of evidence is challenged and the trial judge conducts a *voir dire* to determine admissibility, the general rule is that he should make findings of fact to show the basis of his ruling. *State v. Silver*, 286 N.C. 709, 213 S.E.2d 247 (1975). If there is a material conflict in the evidence on *voir dire*, he must do so in order to resolve the conflict. *State v. Smith*, 278 N.C. 36, 178 S.E.2d 597, *cert. denied*, 403 U.S. 934, 29 L. Ed. 2d 715 (1971). If there is no material conflict in the evidence on *voir dire*, it is not error to admit the challenged evidence without making specific findings of fact, although it is always the better practice to find all facts upon which the admissibility of the evidence depends. *State v. Ladd*, 308 N.C. 272, 302 S.E.2d 164 (1983); *State v. Phillips*, 300 N.C. 678, 268 S.E.2d 452 (1980); *State v. Riddick*, 291 N.C. 399, 230 S.E.2d 506 (1976); *State v. Biggs*, 289 N.C. 522, 223 S.E.2d 371 (1976). In that event, the necessary findings are implied from the admission of the challenged evidence. *State v. Whitley*, 288 N.C. 106, 215 S.E.2d 568 (1975).

*State v. Vick*, 341 N.C. 569, 580, 461 S.E.2d 655, 661 (1995). Furthermore, a trial court's resolution of a conflict in the evidence will not be disturbed on appeal, *State v. Braxton*, 344 N.C. 702, 709, 477 S.E.2d 172, 176 (1996), and its findings of fact are conclusive if they are supported by the evidence, *State v. Robinson*, 346 N.C. 586, 596, 488 S.E.2d 174, 181 (1997). Once this Court concludes that the trial court's findings of fact are supported by the evidence, then this Court's next task "is to determine whether the trial court's conclusion[s] of law [are] supported by the findings." *State v. Hyde*, 352 N.C. 37, ——, —— S.E.2d ——, —— (2000).

[1] Defendant first contends that the trial court erred in denying his motion to suppress evidence obtained from the stop and seizure of defendant on 29 February 1996. Defendant argues that, under the totality of the circumstances, the police did not have a reasonable and articulable suspicion that defendant was engaged in criminal

STATE v. STEEN

[352 N.C. 227 (2000)]

activity and, therefore, defendant's stop was unconstitutional. Defendant also argues that the trial court's conclusion that the stop was justified is erroneous and based upon inadequate factual findings. We disagree.

First, we will address defendant's contention that the trial court based its conclusion upon inadequate findings of fact. However, defendant has failed to specify in what respect the findings are inadequate or which findings are not supported by the evidence. This Court will not review a trial court's findings of fact when defendant merely makes a general contention that the trial court's findings are not supported by the evidence. *State v. Cheek*, 351 N.C. 48, 520 S.E.2d 545 (1999), *cert. denied*, —— U.S. ——, —— L. Ed. 2d ——, 2000 WL 366308 (June 19, 2000) (No. 99-8913). In *Cheek*, this Court addressed a similar contention as follows:

> In this assignment of error, defendant has failed to specifically except to any of the trial court's findings of fact relating to this motion. Defendant has additionally failed to identify in his brief which of the trial court's . . . findings of fact are not supported by the evidence. Therefore, this Court's review of this assignment of error is limited to whether the trial court's findings of fact support its conclusions of law.

*Id.* at 63, 520 S.E.2d at 554.

[2] Because defendant has assigned error to the trial court's findings only in a general fashion, the focus of our analysis is whether the trial court's findings overall support its conclusion that the stop of defendant was constitutional. This Court has held:

> An investigatory stop must be justified by "a reasonable suspicion, based on objective facts, that the individual is involved in criminal activity." *Brown v. Texas*, 443 U.S. 47, 51, 61 L. Ed. 2d 357, 362 (1979).

> A court must consider "the totality of the circumstances—the whole picture" in determining whether a reasonable suspicion to make an investigatory stop exists. *U.S. v. Cortez*, 449 U.S. 411, 417, 66 L. Ed. 2d 621, 629 (1981). The stop must be based on specific and articulable facts, as well as the rational inferences from those facts, as viewed through the eyes of a reasonable, cautious officer, guided by his experience and training. [*Terry v. Ohio*, 392 U.S. 1, 21-22, 20 L. Ed. 2d 889, 906 (1968)]; *State v. Thompson*, 296 N.C. 703, 706, 252 S.E.2d 776, 779, *cert. denied*, 444 U.S. 907,

**STATE v. STEEN**

[352 N.C. 227 (2000)]

62 L. Ed. 2d 143 (1979). The only requirement is a minimal level of objective justification, something more than an "unparticularized suspicion or hunch." *U.S. v. Sokolow*, 490 U.S. 1, 7, 104 L. Ed. 2d 1, 10 (1989).

*State v. Watkins*, 337 N.C. 437, 441-42, 446 S.E.2d 67, 70 (1994). In the case *sub judice*, we have carefully reviewed the trial court's findings as to this issue, and we hold the trial court did not base its conclusion upon inadequate findings of fact. The police in this case observed that defendant operated the bicycle in "an erratic and reckless manner" by weaving in heavy traffic, and that defendant's dangerous operation of the bicycle constituted a "motor traffic offense." Additionally, the trial court found that when the officers pulled defendant over on the bike, they asked defendant if they could speak to him, and defendant agreed. We therefore conclude that the officers' observation of the manner and place in which defendant was riding his bicycle was sufficient to raise "a reasonable suspicion to make an investigatory stop" under the above standards.

[3] With regard to the search of his person subsequent to the stop, defendant argues that this was illegal because his consent to the search was involuntary. It appears that defendant bases this argument solely on the ground that Officers Mullis and Ensminger illegally detained him. As noted above, we have already concluded that the trial court properly found that the stop was justified by reasonable and articulable suspicion and that it was thus a valid stop. Officers who lawfully stop someone for investigation may ask the person a moderate number of questions to determine his identity and to gain information confirming or dispelling the officers' suspicions that prompted the stop. *Berkemer v. McCarty*, 468 U.S. 420, 439, 82 L. Ed. 2d 317, 334 (1984).

The trial court in the instant case found "that the defendant had prior experiences with the criminal justice system, having been previously arrested and convicted of felonies on three separate occasions." In addition, the trial court found that after defendant agreed to speak with the officers, the officers noticed that defendant had an odor of alcohol about him and that his eyes appeared to be dilated. The trial court also found that after making these observations, the officers asked defendant if they could search him, and again defendant agreed. One of the officers then observed what appeared to be blood spots on defendant's shirt and person. Defendant does not dispute these findings of fact. N.C.G.S. § 15A-221(b) provides that a con-

sent to a search requires a voluntary statement to the officer giving the officer permission to make a search. " '[T]he question whether a consent to a search was in fact "voluntary" or was the product of duress or coercion, expressed or implied, is a question of fact to be determined from the totality of all the circumstances.' " *State v. Brown*, 306 N.C. 151, 170, 293 S.E.2d 569, 582 (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 227, 36 L. Ed. 2d 854, 862-63 (1973)), *cert. denied*, 459 U.S. 1080, 74 L. Ed. 2d 642 (1982). Based on our review of the trial court's findings in this regard, we conclude that the trial court properly determined that defendant voluntarily consented to the search of his person.

**[4]** Defendant next contends that the search and seizure of his clothing on 6 March 1996 was unlawful and unconstitutional. The trial court made extensive findings of fact, based on its four-day hearing, including the following: that defendant was arrested and taken to jail on 29 February 1996; that defendant's clothing was taken upon his arrival at the jail; that defendant was issued a standard jail jumpsuit; that defendant's clothing was available to him only upon his release from jail; that on 6 March 1996, Officer H.L McMillian went to the jail to obtain defendant's clothes for analysis of blood and glass particles; that Officer McMillian did not inform defendant that he was a suspect in the murder investigation; that Officer McMillian gained written consent from defendant by telling defendant that he was a suspect in an armed robbery investigation; and that defendant subsequently gave consent for Officer McMillian to take his clothes for examination.

The trial court then concluded

[t]hat the clothes that were taken from the defendant for analysis, . . . that was a valid exercise of police power in view of the fact, regardless of reasons that were given to the defendant for the taking of the clothes, because they were in the process of taking and analyzing clothes that were already in their possession, nothing being taken from him, and the defendant had no privacy rights in clothes that he didn't even have on him at the time that they were obtained for those particular purposes.

Defendant argues that this conclusion is erroneous and based upon inadequate factual findings. Specifically, defendant argues that the warrantless search and seizure is not valid because it was not closely related to the reason defendant was arrested. *State v. Farmer*, 333 N.C. 172, 189, 424 S.E.2d 120, 130 (1993). Defendant was first arrested

STATE v. STEEN

[352 N.C. 227 (2000)]

for possession of drug paraphernalia and stolen credit cards, not for suspicion of murder, and while in custody on these charges, he became a focus of the investigation of the murder in this case.

Defendant also contends that the clothes that were taken at the jail were not in the possession of the police and that the search of those clothes does not constitute a "search incident to arrest." Defendant asserts that the jail served only as a custodian of his property. Further, defendant asserts that officers used false pretenses to obtain his consent to the search of his clothes. These arguments are without merit.

"It is well settled in North Carolina that clothing worn by a person while in custody under a valid arrest may be taken from him for examination." *State v. Dickens*, 278 N.C. 537, 543, 180 S.E.2d 844, 848 (1971). Also, the United States Supreme Court has held that

> once the accused is lawfully arrested and is in custody, the effects in his possession at the place of detention that were subject to search at the time and place of his arrest may lawfully be searched and seized without a warrant even though a substantial period of time has elapsed between the arrest and subsequent administrative processing, on the one hand, and the taking of the property for use as evidence, on the other.

*United States v. Edwards*, 415 U.S. 800, 807, 39 L. Ed. 2d 771, 778 (1974), *quoted in State v. Payne*, 328 N.C. 377, 396, 402 S.E.2d 582, 593 (1991). In the instant case, because defendant was in police custody pursuant to a valid arrest, and the clothing in question had already been administratively taken from defendant's possession, the trial court correctly determined that the officers were well within their authority in obtaining defendant's clothing, regardless of the reasons the officers used for the consent. Since defendant was lawfully in custody and even "the effects in his possession . . . may lawfully be searched and seized without a warrant," the question of defendant's consent at this point is irrelevant. Further, as we have noted above, defendant had already voluntarily consented to the search of his person, which included his clothing. Accordingly, we conclude that the search of defendant's clothing was not unconstitutional or otherwise unlawful. Additionally, we note that the analysis of the glass particles and blood found in and upon defendant's clothes showed the glass did not compare with the glass at the victim's home and the blood was not the victim's, but rather was defendant's.

[5] Defendant next contends that the statements he made on 16 March 1996 were involuntary and that they were tainted by police coercion. Defendant argues that the trial court's conclusion to the contrary was erroneous and based upon inadequate factual findings. Because defendant does not specify which of the trial court's findings of fact he contends are inadequate, we will limit our review to whether the trial court's findings of fact support its conclusions of law. *State v. Cheek*, 351 N.C. at 63, 520 S.E.2d at 554.

We note at the outset of our analysis here that defendant acknowledges in his brief that none of his statements were admitted into evidence, and we further note that the trial court made a specific finding that "no incriminating statement was made." The trial court made extensive findings of fact with respect to each of defendant's interviews and exchanges with the investigating officers, and our review of the record relating to all of these interviews and exchanges does not reflect the slightest hint of coercion or any police impropriety. Further, the record at this point shows that defendant was properly given his *Miranda* rights at the appropriate time, when he was first placed in custody. The record supports the trial court's findings of fact, and the findings of fact support the conclusions of law. Accordingly, we conclude these arguments are without merit, and the trial court properly determined that defendant's statements to the police were voluntary and were not in violation of *Miranda*.

[6] Next, defendant contends that the police unlawfully took hair and saliva samples from him on 16 March 1996, following his arrest for the murder. Defendant argues that the trial court erroneously concluded that the police did not need a court order or a search warrant to obtain samples of his hair and saliva because "they were taken while the defendant was in custody incident to arrest." We disagree and affirm the trial court's conclusion.

Defendant does not dispute the trial court's finding of fact that defendant was in police custody when the hair and saliva samples were taken from him. This Court has approved warrantless seizures of hair and saliva samples from a defendant incident to his arrest. *State v. Cobb*, 295 N.C. 1, 19-20, 243 S.E.2d 759, 769-70 (1978). Our review of the record in this case reveals that defendant was in custody approximately six hours prior to the taking of samples of his hair and saliva. There is no indication that there were any intervening events which broke the continuity between defendant's arrest and the collection of hair and saliva samples. Furthermore, this Court has

approved the taking of samples of a defendant's hair and saliva as long as one day following a defendant's arrest and upon the basis of the defendant's being in police custody, rather than on the basis of the taking being incident to arrest. *State v. Thomas*, 329 N.C. 423, 437-38, 407 S.E.2d 141, 150-51 (1991). Accordingly, we hold the trial court did not err in concluding that neither a court order nor a search warrant was necessary for the police to take hair and saliva samples from defendant in the instant case.

**[7]** Finally, defendant contests the validity of the search of defendant's residence pursuant to a search warrant. Specifically, defendant argues that the information contained in the application for a search warrant on 17 March 1996 was false or was the product of unconstitutional procedures, in that the application for the warrant contained insufficient evidentiary information to establish probable cause in support of a search warrant. Defendant argues that because the search warrant was invalid, the evidence obtained as a result of the search of defendant's residence should be suppressed. We disagree.

In determining whether there is sufficient probable cause to justify a search warrant, a magistrate must consider the facts under the totality-of-circumstances standard. *State v. Arrington*, 311 N.C. 633, 641, 319 S.E.2d 254, 257 (1984). An application for a search warrant is sufficient when the affidavit supporting the application

> supplies reasonable cause to believe that the proposed search for evidence probably will reveal the presence upon the described premises of the items sought and that those items will aid in the apprehension or conviction of the offender. Probable cause does not mean actual and positive cause nor import absolute certainty. The facts set forth in an affidavit for a search warrant must be such that a reasonably discreet and prudent person would rely upon them before they will be held to provide probable cause justifying the issuance of a search warrant. A determination of probable cause is grounded in practical considerations. .

*Id.* at 636, 319 S.E.2d at 256 (citations omitted).

There is a presumption of validity with respect to the affidavit supporting a search warrant. *State v. Fernandez*, 346 N.C. 1, 14, 484 S.E.2d 350, 358 (1997). A defendant nonetheless may challenge the truthfulness of the testimony showing probable cause and thereby

challenge the validity of the warrant. *Id.* at 13-14, 484 S.E.2d at 358. This opportunity is expressly provided by N.C.G.S. § 15A-978(a), which defines truthful testimony as "testimony which reports in good faith the circumstances relied on to establish probable cause." N.C.G.S. § 15A-978(a) (1999). The mere presence of incorrect facts in the affidavit, however, does not necessarily mean the affiant is not being truthful. *Fernandez*, 346 N.C. at 13, 484 S.E.2d at 358. The long-standing rule in North Carolina is that in order for a claim for relief based on falsity in the affidavit to succeed, " 'the evidence must establish facts from which the finder of fact might conclude that the affiant alleged the facts in bad faith.' " *Id.* at 14, 484 S.E.2d at 358 (quoting *State v. Winfrey*, 40 N.C. App. 266, 269, 252 S.E.2d 248, 249, *disc. rev. denied*, 297 N.C. 304, 254 S.E.2d 922 (1979)).

The trial court in the case *sub judice* ultimately concluded that the officers acted in good faith in supplying information to the magistrate for the search warrant. However, defendant makes several arguments as to why the trial court erred in reaching this conclusion. Upon review, we find these arguments unpersuasive. First, defendant contends that when the investigators applied for the search warrant, they relied heavily on the fact that the victim's bloody body was discovered on 29 February 1996, the same day defendant was arrested on a different charge and was observed with blood on his clothing. Defendant asserts that the investigators intentionally did not disclose to the magistrate that the victim had been dead for three days when the victim's body was found, in order to create an incriminating coincidence linking defendant with the murder. However, our review of the record reveals that Officer William E. Ward testified during the suppression hearing that the medical examiner could not pinpoint a specific time when the beating of the victim occurred. Officer Ward testified that he was aware that the victim's injuries could have occurred on the 29th, or prior to the 29th, and that he told the magistrate that the homicide occurred on or before, or on or about, February 29th. Officer Ward's testimony is sufficient evidence for the trial court to conclude that Officer Ward acted in good faith in informing the magistrate of the approximate date of the murder.

Second, defendant asserts that the search warrant also relied upon the finding of glass particles on defendant's clothing. Defendant argues that only one glass particle was found, and a test showed that it had come from a source other than from the victim's door. Defendant also asserts that the test revealing the source of the glass was completed three days prior to the application for the search war-

rant. Therefore, defendant contends that the officers should have had the completed test results when they applied for the search warrant. Defendant argues that the failure to learn the source of the glass prior to their application for the search warrant shows that the officers had a "reckless disregard" for the accuracy of the search warrant application. However, the trial court found that the magistrate knew that the results of the glass test were still pending when the magistrate issued the search warrant. Additionally, the trace evidence analyst with the Charlotte-Mecklenburg Police Department, Linus Whitlock, testified at the suppression hearing that he completed the tests on 14 March 1996. Whitlock further testified that he did not inform anyone of the test's results, except for his supervisor, until 18 March 1996, the day following application for the search warrant. Because the evidence indicates that the officers were not aware that the tests were even completed, we cannot conclude that the officers' failure to obtain the test results prior to applying for the search warrant amounted to an act of bad faith.

Third, defendant argues that the search warrant application is inconsistent with one of the trial court's findings of fact. Defendant asserts that the application refers to defendant's sale of the television to Charlie Davis, but the trial court found that defendant made no "incriminating statements." When Officers Ward and McMillian questioned defendant on 16 March 1996, defendant offered several exculpatory statements. Defendant stated, *inter alia*, that Charlie Davis would be able to provide an alibi for him. Later, when defendant was confronted with the fact that the police had recovered the television from Davis, who said defendant sold the television to him, defendant claimed that he had found the television on the side of the road. Defendant stated that he took the abandoned television to Davis' house and sold it to him for twenty or thirty dollars. The evidence thus supports that defendant told the officers that he sold the television to Davis. We have thoroughly reviewed the trial court's order denying defendant's motion to suppress, and we conclude that the trial court's finding that defendant did not make an incriminating statement after he waived his *Miranda* rights was simply a comment that defendant never confessed to committing the murder. In these catchall assertions, defendant lists several other complaints of a similar nature which we find to be totally without merit. Defendant has failed to show any material inconsistency in the trial court's pertinent findings of fact. We therefore conclude that the trial court's findings support its conclusion that the officers applying for the search warrant acted in good faith. We also conclude that the trial court cor-

rectly determined that there was a sufficient showing of probable cause to justify the search warrant.

This assignment of error is overruled.

**[8]** In his next assignment of error, defendant asserts that he is entitled to a new trial because the trial court erred in various rulings prior to and during jury selection. Defendant first argues that during the State's initial questioning of prospective jurors, the trial court erroneously permitted the prosecutor to inform jurors that the death penalty was required to be imposed if the State proved an aggravating circumstance beyond a reasonable doubt. Defendant tenders the following quote as an example of what the prosecutor told several prospective jurors:

> Do you all further understand that it is not every first-degree murder case in which the State can even ask for the death penalty? For example, in order for the State to be able to ask for the death penalty in a particular first-degree murder case, the State must be able to prove to you beyond a reasonable doubt the existence of an aggravating circumstance.

Defendant contends that this statement, and others substantially similar to it, was improper because the prosecutor gave only a "scant mention" of mitigating circumstances. Additionally, defendant argues that the prosecutor failed to mention mitigating circumstances when he questioned individual prospective jurors. The prosecutor stated the following to the first prospective juror:

> [I]f and when we get to that portion of this trial, which would be described as the punishment phase, or a phase two of the trial, the judge at that point will instruct you if you are a juror and all the other jurors as to the procedure to go through in terms of evaluating any aggravating circumstance and any mitigating circumstance that the defense may prove in this case.

Defendant notes that the above-quoted statement was the first mention of mitigating circumstances to any of the prospective jurors. The colloquy between the prosecutor and the first prospective juror then continued as follows:

> [PROSECUTOR]: And do you understand that as the final part of that procedure the State has the burden of proving to you beyond a reasonable doubt that the aggravating circumstance is suffi-

ciently substantial to call for the death of the defendant? Do you understand that, sir?

A. I do.

[PROSECUTOR]: Do you further understand that if the State carries that burden, that is, proves to you beyond a reasonable doubt that the aggravating circumstance is sufficiently substantial to call for the death of this defendant, do you understand that under the law of North Carolina it would then be your duty under the law to vote for the death of the defendant?

[DEFENSE COUNSEL]: Objection.

THE COURT: Overruled.

THE COURT: Do you understand that sir?

A. Yes, I understand.

[PROSECUTOR]: That at that point in the procedure if the State had proven to you beyond a reasonable doubt that the aggravating circumstance was sufficiently substantial to call for the death of the defendant, that it would then be your duty to vote for his death?

[DEFENSE COUNSEL]: Objection.

THE COURT: Overruled.

[PROSECUTOR]: Do you understand, sir?

A. Yes.

[PROSECUTOR]: Would you be able to do that?

[DEFENSE COUNSEL]: Objection.

THE COURT: Overruled.

A. Yes, I would.

Defendant asserts that in the preceding colloquy the prosecutor improperly characterized a juror's duty by explaining that if the State proved a sufficiently substantial aggravating circumstance, then North Carolina law required a juror to vote for the death penalty; that the trial court improperly allowed the prosecutor to repeat such erroneous statements in substantially the same form not less than forty-four times during jury selection; and that these improper questions

and comments adversely affected the composition of the jury and prejudiced defendant because they enabled the State to exclude jurors who were not prepared to vote for a death sentence without considering mitigating circumstances. We disagree.

This Court has stated:

> Both the State and the defendant have the right to question prospective jurors about their views on the death penalty. *State v. Green*, 336 N.C. 142, 159, 443 S.E.2d 14, 24, *cert. denied*, [513] U.S. [1046], 130 L. Ed. 2d 547 (1994). The manner and extent of such an inquiry lie within the trial court's discretion. *Id.* "The trial court has broad discretion to see that a competent, fair, and impartial jury is impaneled, and its rulings in that regard will not be reversed absent a showing of an abuse of its discretion." *State v. Conaway*, 339 N.C. 487, 508, 453 S.E.2d 824, 837-38, [*cert. denied*, 516 U.S. 884, 133 L. Ed. 2d 153] (1995).

*State v. Buckner*, 342 N.C. 198, 213, 464 S.E.2d 414, 422 (1995), *cert. denied*, 519 U.S. 828, 136 L. Ed. 2d 47 (1996). Furthermore, " '[i]n reviewing any *voir dire* questions, this Court examines the entire record of the *voir dire*, rather than isolated questions.' " *Cheek*, 351 N.C. at 66, 520 S.E.2d at 556 (quoting *State v. Jones*, 347 N.C. 193, 203, 491 S.E.2d 641, 647 (1997)).

In *Buckner*, this Court examined an issue similar to defendant's argument in the case *sub judice*. The defendant in *Buckner* contended that the trial court abused its discretion in allowing the prosecutor to ask the following question of each prospective juror:

> If you found that an aggravating circumstance existed and you found that the aggravating factors outweigh the mitigating factors and you found that the aggravating factors were substantially—were sufficiently substantial to call for the imposition of the death penalty; could you return a sentence of death?

*Buckner*, 342 N.C. at 213, 464 S.E.2d at 422. The defendant in *Buckner* argued that the question was improper because it enabled "the prosecutor [to] repeatedly suggest[] to the jurors that they could decide this final issue without reference to mitigating circumstances." *Id.* This Court concluded that the trial court did not abuse its discretion in allowing the prosecutor to ask that question because "[t]he purpose of the question was merely to screen potential jurors' views on capital punishment." *Id.* at 213-14, 464 S.E.2d at 422. Such inquiry is permissible. *Id.* at 214, 464 S.E.2d at 422. Finally, this Court deter-

mined that even assuming *arguendo* that the question was not proper, the trial court's instructions to the jury, which were in accordance with the North Carolina pattern jury instructions, cured any error. *Id.* at 214, 464 S.E.2d at 423.

We have reviewed the complete *voir dire* transcript contained in the record for the case *sub judice*, and we conclude that the trial court did not abuse its discretion in allowing the prosecutor's questions in this regard. The record, in its entirety, reflects that the purpose of the prosecutor's questions during this aspect of the *voir dire* was to determine whether a prospective juror had the ability to vote for the death penalty if that juror found that the aggravating circumstance outweighed any mitigating circumstances. This Court has repeatedly held that counsel may "ask the jurors if they can follow the long-settled law." *State v. Fletcher*, 348 N.C. 292, 310, 500 S.E.2d 668, 678 (1998), *cert. denied*, 525 U.S. 1180, 143 L. Ed. 2d 113 (1999). Even if the prosecutor's questions tended to minimize the proper role or significance of mitigating circumstances, defendant had full opportunity during *voir dire* to explain to prospective jurors the significance of mitigating circumstances in determining the appropriate penalty, and defendant did so with a full explanation. Finally, as this Court held proper in *Buckner*, the trial court in the instant case cured any adverse effect the prosecutor's questions may have had on the jurors when the trial court instructed the jurors at the conclusion of the penalty phase. The trial court explained the procedure for determining punishment in accordance with North Carolina's pattern jury instructions, and this Court presumes that jurors follow the trial court's instructions. *State v. Daniels*, 337 N.C. 243, 275, 446 S.E.2d 298, 318 (1994), *cert. denied*, 513 U.S. 1135, 130 L. Ed. 2d 895 (1995). Accordingly, we conclude that the trial court did not abuse its discretion in overruling defendant's objections to these questions.

[9] By this same assignment of error, defendant argues that the trial court erred in denying defendant's written request that the trial court give prospective jurors instructions explaining the capital sentencing process. Defendant filed a pretrial motion requesting that the trial court inform jurors of the process of finding, evaluating and weighing evidence of aggravating and mitigating circumstances. The trial court refused defendant's request and instead read an instruction which was essentially in accordance with North Carolina's pattern jury instructions.

"In order for a defendant to show reversible error in the trial court's regulation of jury selection, a defendant must show that the

court abused its discretion and that he was prejudiced thereby." *State v. Lee*, 335 N.C. 244, 268, 439 S.E.2d 547, 559, *cert. denied*, 513 U.S. 891, 130 L. Ed. 2d 162 (1994), *quoted in Fletcher*, 348 N.C. at 308, 500 S.E.2d at 677. In rejecting a similar claim, this Court reasoned:

> We find no abuse of discretion by the trial court in refusing to give the defendant's requested preliminary instruction. By utilizing the pattern instruction, a trial court accurately and sufficiently explains the bifurcated nature of a capital trial, avoids potential prejudice to the defendant, and helps to insure the uniformity of jury instructions for all trials.

*State v. Jones*, 339 N.C. 114, 143, 451 S.E.2d 826, 841 (1994), *cert. denied*, 515 U.S. 1169, 132 L. Ed. 2d 873 (1995). Defendant argues that the case *sub judice* is distinguishable from prior holdings on this issue because the trial court erroneously allowed the prosecutor to give improper or incomplete statements of the law. However, as noted above, we have rejected this contention. The trial court properly explained the punishment process, and we conclude that it did not abuse its discretion in refusing defendant's proffered instructions.

**[10]** Defendant also contends under this assignment of error that the trial court abused its discretion in refusing to allow individual *voir dire* and juror sequestration. This Court has consistently denied relief on this basis. *State v. Gregory*, 348 N.C. 203, 208, 499 S.E.2d 753, 757, *cert. denied*, 525 U.S. 952, 142 L. Ed. 2d 315 (1998); *State v. Skipper*, 337 N.C. 1, 57, 446 S.E.2d 252, 284 (1994), *cert. denied*, 513 U.S. 1134, 130 L. Ed. 2d 895 (1995). Defendant does not assert or show how the instant case differs from our prior holdings on this issue, and defendant does not show prejudice. The trial court did not abuse its discretion in denying these requests.

**[11]** Additionally, defendant argues that the trial court erred in denying defendant's motion seeking permission to rehabilitate each juror challenged for cause. Defendant filed a motion prior to jury selection requesting that the trial court allow rehabilitation of every prospective juror the State challenged for cause. The trial court responded as follows:

> Well, that motion is denied. I will on a juror by juror basis give you the right to potentially ask questions if there's some equivocation in their responses which there's a predication for their being challenged for cause. Other than that, I think the court

has within its discretion to preclude those jurors if they clearly and unequivocally state positions that are contrary to their being able to serve.

This Court has held that "[a] defendant has no absolute right to question or to rehabilitate prospective jurors before or after the trial court excuses such jurors for cause." *State v. Warren*, 347 N.C. 309, 326, 492 S.E.2d 609, 618 (1997), *cert. denied*, 523 U.S. 1109, 140 L. Ed. 2d 818 (1998). The defendant in *Warren*, like defendant in the case *sub judice*, sought permission to rehabilitate every juror challenged for cause. *Id.* at 326, 492 S.E.2d at 619. On appeal, this Court found no error in the trial court's denial of defendant's request to rehabilitate each challenged juror and approved the trial court's decision to "exercise its discretion upon each *individual* request for rehabilitation." *Id.* Defendant, in the case *sub judice*, has not shown that the trial court abused its discretion in denying defendant's motion to rehabilitate each juror challenged for cause. The trial court in this instance has properly proceeded pursuant to our holding in *Warren*, and there was no error in this regard.

Finally, defendant contends that the ultimate composition of the jury was flawed because the trial court improperly excused prospective jurors who could not agree to recommend the death penalty without consideration of mitigating circumstances. Specifically, defendant argues that the trial court did not properly determine whether the challenged jurors' views regarding capital punishment would impair each juror's ability to follow the law, because the trial court allowed the prosecutor to misinform the jurors as to what their duties were. Defendant's arguments presuppose that the prosecutor's comments and questions during *voir dire* were improper. However, because we have concluded that there was no impropriety in the prosecutor's conduct during *voir dire*, we conclude that defendant's arguments are without merit. This assignment of error is overruled.

[12] In his next assignment of error, defendant argues that the trial court erred in failing to sufficiently inquire into an alleged improper contact between a juror and a third party. The record reflects that near the end of jury selection, defense counsel told the trial court that an intern with the public defender's office used the same hairdresser as juror number eight, Ms. Sherry Rogers, and that the hairdresser informed the intern that Ms. Rogers had discussed the case with her. The trial court had previously instructed the jury not to discuss the case with anyone. In this regard, the record reflects the following colloquy:

**STATE v. STEEN**

[352 N.C. 227 (2000)]

THE COURT: All right. Let the record reflect the jury's out of the courtroom. What is it, Mr. Williams?

[DEFENSE COUNSEL]: I'm trying to find out. We've just been given a note, Your Honor, about a juror that's already selected. I'm trying to find out what it involves so I can intelligently inform the court if this is a potential juror problem. I don't know whether it is or not; if you'd give me just a moment.

. . . .

[DEFENSE COUNSEL]: —we have just received some information about juror number eight, Ms. Sherry Rogers. The information was given to us by an intern with the Public Defender's Office who has been working with us in the case. And I'll be glad to put her on the stand and question her about it,—

. . . .

THE COURT: What is it?

[DEFENSE COUNSEL]: Well, the issue's been raised that this juror apparently has made some comments to her hairdresser about being on this jury, and apparently it's the same hairdresser that this person has been to. And there was some indication that she had talked about it being circumstantial evidence and some other things; there were some comments about it, and it concerns us.

We're just bringing it to the attention of the court. I'll be glad to put this young lady on the stand, ask her about it under oath. I'll be happy to have the prosecutors ask her about it, the court ask her about it. I don't know; I'm just bringing this to the attention of the court. Whether she just happened to be there and be at the same hairdresser, whether she's an intern with the public defender or not doesn't make any difference.

THE COURT: Well, that information doesn't whet my appetite too much. You got any information this juror is apt to be prejudiced or unfair?

[DEFENSE COUNSEL]: I think if we had to request that you allow us to put this young lady on the witness stand and ask her some questions.

**STATE v. STEEN**

[352 N.C. 227 (2000)]

THE COURT: Did she have any communications with the juror?

. . . .

[DEFENSE COUNSEL]: No, she did not have any communications—

THE COURT: Well, what benefit is that to anybody?

. . . .

[DEFENSE COUNSEL]: Well, if she's formed some opinion based upon the statements to a hairdresser about this case with regard to circumstantial evidence and how she views it, I think that would have some effect on her partiality.

THE COURT: I suspect you better get the hairdresser in here. What you've got here is the one who had her hair dressed. She's not much benefit. She wasn't privy to the conversation. She's too far down the line. Now, if you want to do that, I'll hear from you.

[DEFENSE COUNSEL]: Thank you, Your Honor.

THE COURT: I'll leave it in your court. All right, let's bring the jury back in, please.

On the next day, this colloquy continued:

THE COURT: All right. Before continuing with jury selection, I'm going to ask the defense about what you intend to do about this business that you brought up about this so-called conversation that Ms. Rogers had with the beautician.

[DEFENSE COUNSEL]: We're not sure what to do about it at this point, Your Honor.

THE COURT: What do you mean you're not sure?

. . . .

You've had a day since that time. I need to know, otherwise I'm going to pick two alternates. I'm not going to be buying a pig in a poke here for you to be fishing over what you're going to do about it. Are you going to put on evidence about it? Have you contacted the beautician? Have you done anything about it?

[DEFENSE COUNSEL]: We've advised the court of it, Your Honor, which I and we as officers of this court understand is our duty to do so. Simply bringing the matter to the court, we—

THE COURT: You brought a hearsay matter to the attention of the court—

. . . .

[DEFENSE COUNSEL]: Well, because I think, Your Honor, we are officers of this court and as we're required under the code of ethics and officers of this court, at anytime that there's a question raised about a juror talking about the case in direct violation of the court's instruction, then I think it's incumbent upon us to bring it to the attention of the court. We did that. But we're afraid to do anything else, quite frankly. That's an honest answer.

THE COURT: Well, I'll cure your fear. If you're going to do anything about it, you need to do it. Otherwise, I'm going to start picking two more alternates.

Now, what's your intention? To do nothing or do something?

. . . .

[DEFENSE COUNSEL]: My response to the court's inquiry is that we do not intend to do anything further with regard to investigating this juror or contacting the hairdresser in question. We would request of the court, therefore, that you—that the court has indicated to select two additional alternates, and that you instruct the jurors again, and I made a very specific note, that they not discuss this case with anyone, and emphasize that instruction to them, which would mean they just can't talk about it, period. And maybe that would help alleviate any potential misunderstanding that these jurors may have throughout the trial.

Defendant now argues that the trial court improperly placed the burden on defense counsel to investigate this potential juror misconduct. Defendant contends that it was the trial court's duty, and not that of the defense, to determine whether any misconduct occurred. However, this Court has ruled that "the existence of [juror] misconduct and the effect of [juror] misconduct are determinations within the trial court's discretion." *State v. Murillo*, 349 N.C. 573, 600, 509 S.E.2d 752, 767-68 (1998), *cert. denied,* —— U.S. ——, 145 L. Ed. 2d 87 (1999).

We conclude that defendant has failed to preserve this issue for appellate review. There is no indication in the record that defendant objected to the trial court's response or requested that the trial court further inquire into the matter. Rather, as the above-quoted dialogue

shows, defense counsel's ultimate request to the trial court was for the court to select two more alternate jurors and to specifically instruct all of the jurors not to discuss the case with anyone. Where, as in the case *sub judice*, a defendant has failed to properly object to the trial court's decision, this Court will conclude that defendant has waived this purported error. N.C. R. App. P. 10(b)(1); *State v. Jaynes*, 342 N.C. 249, 262-63, 464 S.E.2d 448, 457 (1995), *cert. denied*, 518 U.S. 1024, 135 L. Ed. 2d 1080 (1996). "Even alleged errors arising under the Constitution of the United States are waived if defendant does not raise them in the trial court." *Jaynes*, 342 N.C. at 263, 464 S.E.2d at 457.

We note that at the conclusion of this assignment of error in his brief to this Court, defendant wrote, "[i]n the event this Court finds that this error was not properly preserved for appellate review, defendant specifically asserts plain error." However, for the reasons discussed herein, we will not review this assignment of error under the plain error rule.

**[13]** This Court adopted the plain error rule in *State v. Odom*, 307 N.C. 655, 300 S.E.2d 375 (1983), and defined the rule as follows:

> [T]he plain error rule . . . is always to be applied cautiously and only in the exceptional case where, after reviewing the entire record, it can be said the claimed error is a "*fundamental* error, something so basic, so prejudicial, so lacking in its elements that justice cannot have been done," or "where [the error] is grave error which amounts to a denial of a fundamental right of the accused," or the error has " 'resulted in a miscarriage of justice or in the denial to appellant of a fair trial' " or where the error is such as to "seriously affect the fairness, integrity or public reputation of judicial proceedings" or where it can be fairly said "the instructional mistake had a probable impact on the jury's finding that the defendant was guilty."

*Id.* at 660, 300 S.E.2d at 378 (quoting *United States v. McCaskill*, 676 F.2d 995, 1002 (4th Cir.), *cert. denied*, 459 U.S. 1018, 74 L. Ed. 2d 513 (1982) (footnotes omitted). In defining the plain error rule, this Court emphasized that "the term 'plain error' does not simply mean obvious or apparent error, but rather has the meaning given it by the court in *McCaskill.*" *Id.*

Initially, this Court applied the plain error rule only to assignments of error relating to Rule 10(b)(2) of the North Carolina Rules

of Appellate Procedure. That rule addresses the preservation of issues relating to jury instructions for appellate review. This Court reasoned:

> The adoption of the "plain error" rule does not mean that every failure to give a proper instruction mandates reversal regardless of the defendant's failure to object at trial. To hold so would negate Rule 10(b)(2) which is not the intent or purpose of the "plain error" rule. *See United States v. Ostendorff*, 371 F.2d 729 (4th Cir.), *cert. denied*, 386 U.S. 982, 18 L. Ed. 2d 229 (1967). The purpose of Rule 10(b)(2) is to encourage the parties to inform the trial court of errors in its instructions so that it can correct the instructions and cure any potential errors before the jury deliberates on the case and thereby eliminate the need for a new trial.

*Odom*, 307 N.C. at 660, 300 S.E.2d at 378. However, this Court later expanded the application of the plain error rule to include also issues regarding the admission of evidence:

> Because of the similarity of the requirements limiting the scope of review in Rules 10(b)(1) and 10(b)(2) and the likeness of the rationale for the adoption of the two rules we conclude, and so hold, that the "plain error" rule as applied in *Odom* to Rule 10(b)(2) applies with equal force to Rule 10(b)(1).

*State v. Black*, 308 N.C. 736, 741, 303 S.E.2d 804, 807 (1983). Even though Rule 10(b)(1) is a general rule pertaining to the preservation of questions for appellate review, this Court has not applied the plain error rule to issues which fall within the realm of the trial court's discretion, and we decline to do so now. For the aforementioned reasons, this assignment of error has been waived, and it is dismissed.

[14] In his next assignment of error, defendant contends that he is entitled to a new sentencing proceeding because the trial court failed to instruct the jury on the (f)(7) statutory mitigating circumstance, defendant's age at the time of the offense. N.C.G.S. § 15A-2000(f)(7) (1999). Our review of the transcript reveals that defendant did not request the trial court to submit this mitigating circumstance to the jury, and there was no discussion during the charge conference regarding the submission of the (f)(7) circumstance. Defendant thus asserts in this issue that, notwithstanding his failure to request submission of the mitigating circumstance, it was the trial court's duty to submit the (f)(7) mitigating circumstance.

**STATE v. STEEN**

[352 N.C. 227 (2000)]

In *State v. Spruill*, 338 N.C. 612, 452 S.E.2d 279 (1994), *cert. denied*, 516 U.S. 834, 133 L. Ed. 2d 63 (1995), as in the case *sub judice*, the defendant did not request the age mitigating circumstance at trial but on appeal contended that the trial court should have submitted that mitigating circumstance. *Id.* at 660, 452 S.E.2d at 305. The evidence in *Spruill* revealed that even though defendant was thirty-one years old, he was "an immature and dependent person who had borderline intelligence." *Id.* Additionally, this Court noted that the defendant in *Spruill* "had worked as an automobile mechanic and in a shipyard, moved on to a better position, attended church, and functioned quite well in the community." *Id.* In determining that the trial court did not err in failing to submit the (f)(7) mitigating circumstance, this Court in *Spruill* reasoned as follows:

> In *State v. Johnson*, 317 N.C. 343, 346 S.E.2d 596 (1986), the Court reiterated that the statutory mitigating circumstance of age is based on a "flexible and relative concept of age." *Id.* at 393, 346 S.E.2d at 624. Nevertheless, evidence showing emotional immaturity is not viewed in isolation, particularly where other evidence shows "more mature qualities and characteristics." *Id.* Where evidence of emotional immaturity is counterbalanced by a chronological age of twenty-three years, apparently normal physical and intellectual development, and experience, the trial court is not required to submit the mitigating circumstance of age.

*Spruill*, 338 N.C. at 660, 452 S.E.2d at 305. Accordingly, this Court will not conclude that the trial court erred in failing to submit the age mitigator where evidence of defendant's emotional immaturity is counterbalanced by other factors such as defendant's chronological age, defendant's apparently normal intellectual and physical development, and defendant's lifetime experience. *Id.*

In the case *sub judice*, defendant was twenty-six at the time of the crime, and all of the expert witnesses at trial agreed that when defendant was twenty-one, he suffered a head injury which caused organic brain damage and resulted in a personality change. There is also evidence showing that defendant's injury caused him to suffer borderline mental retardation with an IQ in the seventy to seventy-nine range, that defendant's performance IQ component was in the lowest percentile, and that defendant's memory was impaired. Tests indicated that defendant had a memory quotient of sixty-three, which falls below the lowest percentile.

However, the record reflects evidence which counterbalances the evidence of defendant's mental condition. Defendant was twenty-six when the murder was committed. Defendant was also competent to manage simple financial transactions and had a "fair" ability to understand, retain and follow instructions. After defendant was released from prison, he resided with his mother. The evidence reflects that defendant understood that he had to follow his mother's rules, that defendant agreed to do so, and also that he agreed to help his mother financially. Defendant also always apologized to his mother after losing his temper with her. Additionally, the testimony of defendant's employer/supervisor at the Myers Park Country Club, regarding defendant's performance as an employee, included observations that defendant was oriented well to his job on the 153-acre golf course; that he quickly picked up on his duties; that he was good in following orders; that he did not demonstrate any memory problems; that he had good common sense; that he was always polite; and that, except for slow speech, he appeared to be a mentally alert person.

Furthermore, the State presented substantial evidence that defendant had the mental capacity to premeditate and plan his crime. The evidence showed defendant had staked out the victim's house. At trial Katherine Stanford, a crime-scene search technician with the Charlotte-Mecklenburg Police Department, testified that on 17 March 1996, she searched defendant's residence pursuant to a search warrant and found a map of the City of Charlotte among defendant's possessions. Two areas of this map had been labeled with hand-drawn circles. One of the circled areas was the Southpark area, and it had a hand-written label with the words "very rich." The other circled area was the Myers Park neighborhood, which was where the victim resided. This area had a hand-written description of "old rich."

Thus, in light of the foregoing evidence of premeditation and evidence that defendant was twenty-six at the time of the murder, that he was gainfully employed and able to perform his job duties proficiently and that he functioned adequately in society, we conclude that the trial court did not err in failing to submit this circumstance. This assignment of error is overruled.

[15] In his next assignment of error, defendant contends that the trial court erred in denying his request for a peremptory instruction on two statutory mitigating circumstances. This Court has repeatedly held that a " 'trial court should, if requested, give a peremptory instruction for any mitigating circumstance, whether statutory or nonstatutory, if it is supported by uncontroverted and manifestly

credible evidence.' " *State v. Richmond*, 347 N.C. 412, 440, 495 S.E.2d 677, 692 (quoting *State v. McLaughlin*, 341 N.C. 426, 449, 462 S.E.2d 1, 13 (1995), *cert. denied*, 516 U.S. 1133, 133 L. Ed. 2d 879 (1996)), *cert. denied*, 525 U.S. 843, 142 L. Ed. 2d 88 (1998).

Defendant argues that the trial court should have given a peremptory instruction on the (f)(2) statutory mitigating circumstance, that defendant was under the influence of a mental or emotional disturbance at the time of the murder. N.C.G.S. § 15A-2000(f)(2). Defendant also argues that the trial court should have peremptorily instructed the jury on the (f)(6) circumstance, that defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired. N.C.G.S. § 15A-2000(f)(6). In support of these two circumstances, defendant offered evidence from his expert witness, Dr. John F. Warren, a clinical psychologist specializing in medical psychology and forensic psychology. Defense counsel questioned Dr. Warren as follows:

Q. How has the loss of intellectual ability and the loss of this special physical skills that he possessed affected him?

A. Well, he described himself as recognizing that he wasn't doing as well as before. He described being frustrated with that, he described continuing to ask for help from doctors and other professionals with regard to his thinking and emotional and physical problems, so he has been experiencing a lot of frustration due to his brain injury.

His brain injury was very, very significant and life threatening, and the dealing with that in the last year since that time has been an extremely frustrating [sic] for him.

Q. Does he have a normal capacity to deal with frustration, or was that affected also?

A. He does not. He has a quite abnormal frustration tolerance as well-documented in the medical records, and in my own personal experience with him when Mr. Steen experiences challenges either verbal challenges or frustrations that exceed his ability to cope, he very quickly exceeds his frustration tolerance.

His ability to stay cool and calm and collected, and he very quickly goes into what has been described in the medical records as rage, or explosiveness, or irrational anger including not only verbal expressions of that but physical expressions of that.

Another expert witness, Dr. Jeffery J. Fahs, a neuropsychiatrist, testified that his diagnosis of defendant was "personality change due to brain injury combined type aggressive and disinhibited." Defendant also presented evidence tending to show that he was borderline retarded, had memory deficits, had a personality disorder and did not have the normal capacity to deal with frustration.

We conclude that the trial court was not required to give a peremptory instruction on the (f)(2) mitigating circumstance in this case because defendant's evidence was not uncontroverted. For example, Dr. Fahs, a defense witness, testified that there was nothing about defendant's condition that would have forced him to beat an elderly lady to death. Additionally, Dr. Wanda Karriker, an expert in psychological evaluations, conducted a disability evaluation of defendant in 1991. At trial, Dr. Karriker testified that she tested defendant and reported the following observations to the Disability Determination Services:

> Attitude toward testing was positive. There was no evidence of gross motor impairment. No involuntary movements were observed. Ability to concentrate and focus attention on the task at hand was poor. [Defendant] appeared to make sincere effort to cooperate with the examiner. Visual motor speed was slow.

Dr. Karriker also testified that defendant's "[a]bility to understand, retain, and follow instructions was fair," and that defendant "is considered competent to manage simple financial transactions." Finally, as noted in the previous assignment of error, defendant's supervisor at the Myers Park Country Club testified that defendant did his job correctly, exhibited no memory problems, came to work on time, picked up his paycheck on time, demonstrated good common sense, caused no trouble and did not appear to be mentally deficient. All of this evidence contradicts defendant's evidence supporting the (f)(2) mitigating circumstance, that defendant was under the influence of a mental or emotional disturbance at the time of the murder. Accordingly, the trial court did not err in failing to give a peremptory instruction for the (f)(2) circumstance.

Evidence in the record also contradicts defendant's evidence supporting the (f)(6) mitigator, that defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired. In addition to the evidence set forth above, Lonnie Henderson, one of defendant's fellow inmates at Central Prison, testified on direct examination as follows:

Q. During the time that you were in Central Prison with the defendant Patrick Steen, did you and he have occasion to spend some time together, playing chess?

A. A game called chess, yes, and we played spades and stuff. He taught me how to play chess. I had never played it; I had never been to prison before.

. . . .

Q. During the time that you spent with the defendant, Mr. Steen, in Central Prison, did there come a time when he talked with you about his murder case?

A. It was some discussion about it, yes, sir.

. . . .

Q. What, if anything, did he tell you about the victim of his crime?

A. He said—some of the stuff I can't recall. It's been a bunch of stuff happened in the past, since then, that's been on my mind.

Some of the stuff that was discussed, it was 80—around an 80 year old lady that was murdered. He had been watching her house. Also, he said that her daughter came back and forth over there to the residence. And he was watching the residence. And when she left and he was on some type of drugs; he was on drugs, narcotics.

. . . .

Q. What did the defendant say to you, about what he did to the 80 year old lady?

A. He said, when he was watching the house over there, when he knew there wasn't nobody there, that's when he had broke in the residence and went in there. And he didn't say exactly how he killed her. He said that he had murdered her, and he had took something; a television, and money, and stuff; pawned it for drugs.

This testimony tends to show that defendant committed a calculated and planned crime, and thus defendant was able to understand and appreciate the criminality of his conduct and was able to conform his conduct to the requirements of the law. Because the evidence of

impaired capacity was not uncontroverted, we conclude that the trial court was not required to give a peremptory instruction on the (f)(6) mitigating circumstance.

Additionally, defendant draws this Court's attention to the fact that the trial court granted defendant's request for peremptory instructions as to several related nonstatutory mitigating circumstances. As to the twelfth nonstatutory mitigating circumstance, the trial court instructed the jury as follows:

> 12, after his brain damage, the defendant, Jody Steen's ability to function on a daily basis was significantly imparied [sic], and his personality changed substantially.

> All the evidence tends to show that after his brain damage, the defendant, Jody Steen's ability to function on the daily basis was significantly impaired, and his personality change[d] substantially. Accordingly, as to this mitigating circumstance, I charge that if one or more of you find the facts to be as all the evidence tends to show, you'll answer that issue number 12 yes, that mitigating circumstance number 12 yes, on the Issues and Recommendation Form. If one or more of you also deem that circumstance to have mitigating value.

Defendant argues that because the trial court correctly recognized that the evidence supporting this nonstatutory circumstance was manifestly credible and uncontroverted, the trial court erred in failing to recognize the same for the two related statutory mitigating circumstances. We disagree. The focus of the nonstatutory circumstance was that after defendant's brain injury, his ability to function on a daily basis was impaired and his personality changed significantly. In contrast, the (f)(2) and (f)(6) circumstances focus on whether the defendant's brain damage caused a mental or emotional disorder which influenced defendant's behavior at the time of the crime, or whether defendant's injury otherwise impaired defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law at the time defendant committed the murder. We cannot conclude that because the trial court determined there was sufficient evidence to warrant a peremptory instruction that defendant's brain injury affected his ability to function on a daily basis and also substantially affected his personality, the trial court necessarily had to find that there was uncontroverted and manifestly credible evidence supporting the circumstances that defendant's brain damage amounted to a mental or emotional dis-

turbance or that defendant was unable to conform his conduct to the requirements of the law at the time of the murder.

Therefore, because there is contradictory evidence refuting the (f)(2) and (f)(6) mitigators in this case, we cannot conclude that defendant's evidence was "uncontroverted and manifestly credible" so as to warrant a peremptory instruction on these statutory mitigators. Accordingly, the trial court did not err in refusing defendant's request, and this assignment of error is overruled.

[16] In his next assignment of error, defendant asserts that he is entitled to a new sentencing proceeding because the trial court erred in refusing to give peremptory instructions on seven nonstatutory mitigating circumstances. Those seven nonstatutory circumstances are listed on the "Issues and Recommendation as to Punishment" form as follows:

(4) Whether the murder was committed while the defendant, Jody Steen, was under the influence of a mental or emotional disturbance that is caused by a medical condition?

(8) Whether in February of 1991, the defendant, Jody Steen, was involved in a motorcycle accident which resulted in severe brain damage?

(9) Whether after emerging from the coma, the defendant, Jody Steen, was unable to speak or walk, requiring extensive rehabilitation and determination on his part?

(11) Whether the defendant, Jody Steen's brain damage was so severe that when he was assessed for social security in June of 1991, he was classified as mentally retarded?

(13) Whether after his brain damage, the defendant, Jody Steen, sought out help for his emotional and mental problems he was experiencing as a result of his brain damage, but he did not receive effective help?

(17) Whether since his brain damage, the defendant, Jody Steen, has been prescribed a number of psychiatric medications, but they were inappropriate medications?

(18) Whether sometimes when he is unable to control his behavior, the defendant, Jody Steen, does not recall the events that occur, and he has been diagnosed with deficits in memory and attention?

We note that the jury found circumstances (4), (8), (11), (13) and (17) to exist and to have mitigating value.

As previously stated, a trial court should grant defendant's request for a peremptory instruction for any mitigating circumstance if that circumstance is supported by "uncontroverted and manifestly credible evidence." *State v. Richmond*, 347 N.C. at 440, 495 S.E.2d at 692. However, defendant does not specifically assess the evidence as to each of these seven asserted circumstances or point out which evidence he believes is "uncontroverted and manifestly credible" and thus supports each of these circumstances. Rather, defendant merely invites this Court to refer to the statement of facts contained in his brief. Because defendant makes no such assessment or argument with cited authorities and does not present this assignment of error in a way for this Court to give it meaningful review, we conclude defendant has abandoned this assignment of error. N.C. R. App. P. 28(a); *State v. Cheek*, 351 N.C. at 71, 520 S.E.2d at 558.

**[17]** In his next assignment of error, defendant contends that the trial court erred in failing to explain to the jury the difference between statutory and nonstatutory mitigating circumstances. Defendant argues that instead of instructing the jury that statutory mitigating circumstances, if found to exist, have mitigating value as a matter of law, the trial court merely described mitigating circumstances generally and instructed the jury to consider all the mitigating circumstances, both statutory and nonstatutory, in the same manner.

The trial court initially instructed the jury as to mitigating circumstances as follows:

A mitigating circumstance is a fact or a group of facts which don't, do not constitute a justification for a killing, or an excuse for a killing, or reduce it to any lesser degree of crime than first degree murder, but which may be considered as extenuating or reducing the moral culpability of the killing, or making the killing less deserving of extreme punishment than other first degree murders.

Our law identifies possible mitigating circumstances. However, in determining the Issue number 2, it'd be your duty to consider as a mitigating circumstance any aspect of the defendant's character, and or record, and any of the circumstances of this murder that the defendant contends is the basis for sentence

less than death, and any other circumstances arising from the evidence which you deem to have mitigating value.

. . . .

If the evidence satisfies any of you that a mitigating circumstance exists, you would indicate that finding on the Issues and Recommendation Form. A juror may find any—any or a juror may find that any mitigating circumstance exists by a preponderance of the evidence, whether or not that circumstance was found to exist by any or the rest of the jurors.

In any event, you would move on to consider the other mitigating circumstances, and continue in a like manner until you have considered all of them, all the mitigating circumstances listed on the form, and any others that you deem to have mitigating value. Now, it will be your duty to consider three statutory mitigating circumstances, and they'll be the first three, and any others that you find from the evidence.

The trial court then proceeded to instruct the jury as to each of the three statutory mitigating circumstances submitted to the jury. After each explanation or statement of a statutory mitigating circumstance, the trial court gave the following instruction or a substantially similar instruction:

If one or more of you find, by the preponderance of the evidence, that this circumstance exists, then you would so indicate by having your foreperson write yes in the space provided after this mitigating circumstance on the Issues and Recommendation Form.

If none of you find this circumstance to exist, you would so indicate by having your foreperson write no in that same space.

The trial court thus completed its instructions regarding statutory mitigating circumstances and then proceeded to nonstatutory circumstances. The trial court stated:

Then members of the jury, you go to what's to the remainder of these or non-statutory mitigating factors, and they start with number four and you should, you should consider those circumstances starting with number four and following from it that arise from the evidence, which you find to have mitigating value. And if any one or more of you find—if any one of or more of you find,

by a preponderance of the evidence, that any of these following or additional mitigating circumstances exist, and also are deemed to have, or deemed by you to have mitigating value, then you would so indicate by having your foreperson write yes in the space provided after each of the circumstance as it applies.

These instructions are consistent with the pattern jury instructions for capital sentencing proceedings. *See* N.C.P.I.—Crim. 150.10 (1998).

In *State v. Hedgepeth*, 350 N.C. 776, 517 S.E.2d 605 (1999), *cert. denied*, —— U.S. ——, —— L. Ed. 2d ——, 68 U.S.L.W. 3565 (2000), this Court recently reaffirmed that a jury is properly instructed as to the difference between statutory and nonstatutory mitigating circumstances when the trial court follows the pattern jury instructions. *Id.* at 790, 517 S.E.2d at 613-14. The trial court in *Hedgepeth*, just like the trial court in the case *sub judice*, instructed the jury from the appropriate pattern jury instruction, N.C.P.I.—Crim. 150.10, and thus the instructions in *Hedgepeth* are substantially similar in both form and content to the instructions at issue here. *Hedgepeth*, 350 N.C. at 790, 517 S.E.2d at 613-14. Therefore, we conclude that here, as in *Hedgepeth*,

"the trial court properly informed the jurors that in order to find a statutory mitigating circumstance to exist, all [the jury] must find is that the circumstance is supported by a preponderance of the evidence. However, unlike statutory mitigating circumstances, the trial court instructed the jurors that in order to find nonstatutory mitigating circumstances, they must (1) find by a preponderance of the evidence that the circumstance existed, *and* (2) find that the circumstance has mitigating value. These instructions properly distinguished between statutory and nonstatutory mitigating circumstances and informed the jurors of their duty under the law."

*Id.* at 790, 517 S.E.2d at 614 (quoting *State v. Davis*, 349 N.C. 1, 56, 506 S.E.2d 455, 485 (1998), *cert. denied*, 526 U.S. 1161, 144 L. Ed. 2d 219 (1999)).

However, even though the jury instructions in the case *sub judice* are substantially similar to those this Court has previously upheld, defendant argues that the trial court committed error because the instructions, considered in their entirety, informed the jurors, in effect, that they could elect to give no weight to a statutory mitigating circumstance that they found to exist. Defendant asserts that

because there were twenty nonstatutory mitigating circumstances submitted (including the catchall), the trial court repeated the · instruction that a juror must find both that the mitigating circumstance existed *and* that it had mitigating value at least nineteen times. Defendant argues that because that particular instruction was repeated so many times, a reasonable juror would conclude that he or she must apply that instruction to all mitigating circumstances, statutory and nonstatutory alike. Further, defendant asserts that this error is compounded by the fact that the trial court commingled statutory and nonstatutory circumstances in its preliminary general instructions. We disagree.

The number of times a jury is instructed as to nonstatutory mitigating circumstances necessarily parallels the number of nonstatutory mitigating circumstances that defendant requests and the trial court submits to the jury. When the trial court instructed the jury as to the nonstatutory mitigating circumstances, the trial court in the normal course and context of its charge had already properly instructed the jury with regard to the statutory mitigating circumstances. As previously noted, the instructions in this case were given in accordance with the law. This Court presumes that the jury understood and followed the trial court's instructions. *State v. Daniels*, 337 N.C. at 275, 446 S.E.2d at 318. This assignment of error is overruled.

[18] In his next assignment of error, defendant argues that he is entitled to a new sentencing proceeding because the trial court's instructions regarding defendant's statutory and nonstatutory mitigating circumstances were confusing and incorrect. Defendant requested that the trial court submit the statutory and nonstatutory mitigating circumstances to the jury in the form of a declarative contention or statement of fact, to which the jurors could indicate their agreement or disagreement with a "yes" or "no" answer. However, in giving its instructions, the trial court changed each of these declarative statements to a neutral, conditional phrase beginning with "whether." In contrast, defendant points out the trial court submitted the aggravating circumstances to the jury as unambiguous or less neutral questions beginning with "was." Defendant argues that the submission of the mitigating circumstances as neutral, conditional phrases beginning with "whether" failed to place defendant's contentions squarely before the jury. This contention is without merit.

Defendant presents no authority in support of his argument that a question beginning with the word "whether" does not call for a

"yes" or "no" answer. North Carolina's pattern jury instructions provide for the use of the word "whether" in setting out mitigating circumstances. N.C.P.I.—Crim. 150.10. The record reflects that the trial court instructed the jury in accordance with the pattern jury instructions. Our review of the record shows that the jury well understood that the questions on the Issues and Recommendation as to Punishment form called for either a "yes" or "no" answer and that the jury answered the questions accordingly. Thus, we conclude that the trial court did not err in following the pattern jury instructions.

[19] Under the same assignment of error, defendant contends that the trial court improperly phrased the instruction for number sixteen of defendant's nonstatutory mitigating circumstances. The trial court gave the following instruction:

Number 16, whether the defendant, Jody Steen, received effective treatment for his brain disorder. If any one or more of you find this mitigating circumstance to exist by a preponderance of the evidence, and any one or more of you deem it to have mitigating value, then you would answer number 16 yes. If none of you deem it to have that, that circumstance to—strike that. If none of you find it to exist, and or if none of you deem it to have mitigating value, then you would answer 16 no.

Defendant argues that the trial court's phrasing of this instruction, as well as the phrasing of this circumstance on the Issues and Recommendation as to Punishment form, conveyed the opposite of defendant's contention that he did not receive effective treatment for his brain disorder. Defendant contends that this instruction, as phrased by the trial court, was confusing to the jury and therefore constituted prejudicial error. We disagree.

There is no indication in the record that defendant objected to the trial court's instructions or to the Issues and Recommendation as to Punishment form on the ground he now asserts. Rule 10(b)(2) of the North Carolina Rules of Appellate Procedure addresses the preservation of jury instruction issues for appellate review.

A party may not assign as error any portion of the jury charge or omission therefrom unless he objects thereto before the jury retires to consider its verdict, stating distinctly that to which he objects and the grounds of his objections; provided, that opportunity was given to the party to make the objection out of the

hearing of the jury, and, on request of any party, out of the presence of the jury.

N.C. R. App. P. 10(b)(2). Because defendant failed to object to the jury instructions on the grounds stated in this assignment of error, defendant has failed to properly preserve this argument for appellate review. Defendant is therefore entitled to review pursuant only to the plain error rule. N.C. R. App. P. 10(c)(4); *State v. Call*, 349 N.C. 382, 424, 508 S.E.2d 496, 522 (1998). "In order to prevail under a plain error analysis, defendant must establish not only that the trial court committed error, but that 'absent the error, the jury probably would have reached a different result.' " *State v. Sierra*, 335 N.C. 753, 761, 440 S.E.2d 791, 796 (1994) (quoting *State v. Jordan*, 333 N.C. 431, 440, 426 S.E.2d 692, 697 (1993)).

The jurors' responses on the Issues and Recommendation as to Punishment form indicate that at least one juror found nonstatutory mitigating circumstance number sixteen to exist and deemed it to have mitigating value. Nonstatutory mitigating circumstance number sixteen was thus found and answered in defendant's favor on the form. Therefore, defendant has failed to show prejudice. Even assuming *arguendo* that the instruction confused the jurors, we cannot conclude that it rises to the level of plain error. Because at least one juror found circumstance number sixteen to exist and to have mitigating value, defendant cannot show that "absent the error, the jury probably would have reached a different result." *State v. Jordan*, 333 N.C. at 440, 426 S.E.2d at 697. This assignment of error is overruled.

[20] By his next assignment of error, defendant contends that he is entitled to a new sentencing proceeding because the trial court incorrectly instructed the jury that "your answers [on the Issues and Recommendation as to Punishment form] to Issues 1, 2, 3, and 4, either yes or no must be unanimous." The United States Supreme Court has held that it is a violation of the Eighth Amendment of the federal Constitution to require a capital sentencing jury to be unanimous in finding the existence of mitigating circumstances. *McKoy v. North Carolina*, 494 U.S. 433, 108 L. Ed. 2d 369 (1990). Because Issue Two on the Issues and Recommendation as to Punishment form deals with whether the jury determines that the mitigating circumstances exist, defendant argues that his constitutional rights were violated. We disagree.

The record reflects that the trial court essentially followed the pattern jury instructions throughout its penalty phase charge.

However, the transcript reveals one sentence where the trial court erroneously deviated from the approved instructions. During its preliminary charge to the jury, the trial court stated:

> When you retire to deliberate your recommendation as to punishment, you'll take with you a form entitled Issues and Recommendation as to Punishment. That form includes a written list of four issues relating to aggravating and mitigating circumstances, and I'm going to take these four issues up with you in greater detail and one by one.
>
> Now, to enable you to follow me more easily, the Bailiff is going to give you a copy of—give each of you a copy of that form that is entitled Issues and Recommendation as to Punishment, which you'll take with you when you retire to deliberate.
>
> Now, don't read ahead on the form, but refer to it as I instruct you on the law as we go through it.
>
> Again, your answers to Issues 1, 2, 3, and 4, either yes or no must be unanimous.

This last sentence reflects the trial court's single error.

We cannot discern from the record whether that one sentence in the trial court's preliminary instruction merely contained a *lapsus linguae* by including Issue Two in that portion of the challenged instruction, or whether there was a mistake in the transcription of the instruction. *State v. Sanderson*, 346 N.C. 669, 684-85, 488 S.E.2d 133, 141 (1997). However, prior to determining whether this error misled the jury, we note that defendant failed to object to the trial court's instruction at issue. Accordingly, this Court's review of this assignment of error is limited to one for plain error. N.C. R. App. P. 10(c)(4); *State v. Call*, 349 N.C. at 424, 508 S.E.2d at 522. Looking at the trial court's instructions in its entirety, we conclude that the error was harmless.

Following its preliminary instruction, the trial court specifically instructed the jury as to each of the four issues on the Issues and Recommendation as to Punishment form. Following its specific instructions as to Issue One, the trial court instructed the jury as to Issue Two relating to the mitigating circumstances as follows:

> If the evidence satisfies *any of you* that a mitigating circumstance exists, you would indicate that finding on the Issues and Recommendation Form. *A juror may find any—any or a juror*

STATE v. STEEN

[352 N.C. 227 (2000)]

*may find* that any mitigating circumstance exists by a preponderance of the evidence, *whether or not that circumstance was found to exist by any or the rest of the jurors.*

(Emphasis added.) Here, the trial court clearly explained that only one or more jurors needed to find that a mitigating circumstance existed.

The trial court then stated that there were three statutory mitigating circumstances submitted for the jury's consideration, and the trial court proceeded to describe each circumstance in detail. After its description of the first statutory circumstance, and before moving to the second circumstance, the trial court gave the following instruction:

If *one of or more of you find,* by the preponderance of the evidence, that this circumstance exists, then you would so indicate by having your foreperson write yes in the space provided after this mitigating circumstance on the Issues and Recommendation form.

If none of you find that circumstance to exist, you would so indicate by having your foreperson write no in that same space.

(Emphasis added.) The trial court then repeated this instruction, or gave one substantially similar to it, following its description of the second and third statutory mitigating circumstances.

In addition, prior to giving the jury detailed instructions as to each nonstatutory mitigating circumstance, the trial court stated, as part of its instruction hereinabove set out, as follows:

*And if any one or more of you find—if any one of or more of you find,* by a preponderance of the evidence, that any of these following or additional mitigating circumstances exist . . . .

If none of you find the circumstance to exist or if none of you deem it to have mitigating value . . . .

(Emphasis added.)

Finally, when the trial court proceeded to instruct the jury as to Issue Three, the trial court stated:

Members of the jury, if you find from the evidence one or more mitigating circumstances, you must weigh the aggravating circumstance or circumstances against the mitigating circum-

stance or circumstances, and when deciding this issue, *each juror may consider any mitigating circumstance or circumstances that the juror determined* to exist by a preponderance of the evidence in issue number 2.

(Emphasis added.)

After reviewing the trial court's specific instructions regarding Issue Two, it is clear that the trial court understood that the law did not require the jurors to unanimously find a mitigating circumstance. We therefore conclude that the portion of the preliminary charge stating that the jury's "answers to Issues 1, 2, 3, and 4 . . . must be unanimous" was merely a *lapsus linguae* by the trial court. We also conclude that the trial court's instructions overall "make it clear that each juror could find any submitted mitigating circumstance to exist . . . [and that the instructions] plainly state that unanimity is not required for a finding of any mitigating circumstance." *State v. Sanderson*, 346 N.C. at 683, 488 S.E.2d at 141. Furthermore, it is significant that the Issues and Recommendation as to Punishment form contains the following instruction:

Before you answer Issue Two, consider each of the following mitigating circumstances. In the space after each mitigating circumstance, write "yes," *if one or more of you finds that circumstance* by a preponderance of the evidence. Write, "no," if none of you finds that mitigating circumstance.

(Emphasis added.)

Notwithstanding the trial court's *lapsus linguae* in its preliminary instruction, the record shows the trial court clearly and unambiguously instructed that for each of the mitigating circumstances submitted in Issue Two, only one or more of the jurors was required to find that a mitigating circumstance existed. It is also clear from the trial court's instruction regarding Issue Three that no juror was precluded from considering any mitigating circumstance or evidence that he or she found in Issue Two. The instructions contained in the Issues and Recommendation as to Punishment form further clarify that the jury need not be unanimous in finding a mitigating circumstance. Accordingly, we conclude that the trial court's error was harmless beyond a reasonable doubt. This assignment of error is overruled.

In his next assignment of error, defendant argues that he is entitled to a new sentencing proceeding because the trial court's rulings

during jury *voir dire,* jury instructions, and closing arguments deprived the jury of a correct instruction on the sentence of "life without parole."

[21] First, defendant contends that the trial court erred in denying defendant's general request to question prospective jurors regarding their understanding of parole eligibility in capital cases. This Court has considered this issue and decided it against defendant's position. *State v. Skipper,* 337 N.C. at 24, 446 S.E.2d at 264. However, defendant argues that N.C.G.S. § 15A-2002 imposes a duty upon trial courts to instruct juries that life imprisonment means life without parole. That statute provides, in pertinent part:

> The judge shall instruct the jury, in words substantially equivalent to those of this section, that a sentence of life imprisonment means a sentence of life without parole.

N.C.G.S. § 15A-2002 (1999). Defendant's argument is misplaced. This statute requires the trial court to give the jury an instruction on the meaning of life imprisonment during the sentencing proceeding following trial. *Skipper,* 337 N.C. at 43, 446 S.E.2d at 275. N.C.G.S. § 15A-2002 does not apply to the jury selection process. Defendant's argument is meritless.

[22] Defendant also assigns error to the trial court's refusal to instruct the jury as to the changes in the laws regarding parole. The trial court refused defendant's request to give the following jury instruction:

> You have received evidence that indicates that at some time in the past, the defendant was paroled from prison without serving the sentence he received in its entirety.
>
> I instruct you that the law of North Carolina has changed from that applied in those earlier and different cases in that parole no longer [exists] for offenses committed after October 1, 1994.
>
> I instruct you that as applied to the sentence you are considering today, the applicable law provides for only two results death by execution, or life imprisonment without parole.

Defendant failed to cite any authority in support of his contention that the trial court was required to specifically explain to the jury how the parole laws have changed since "earlier and different cases." Furthermore, defendant failed to show how the fact that he was

paroled after his breaking and entering convictions would have confused the jury about the possibility of parole for a first-degree murder conviction.

Based upon our review of the record in its entirety, we conclude that the jury was informed that defendant in the instant case would be sentenced to either death or life imprisonment without parole. For example, after closing arguments were completed, the trial court charged the jury as follows:

> Members of the jury, having found the defendant guilty of murder in the first degree, it is now your duty to recommend to the court whether the defendant should be sentenced to death or to *life imprisonment without parole.* Your recommendation, whichever it would be, would be binding upon the court. If you unanimously recommend that the defendant be sentenced to death, the court will impose a sentence of death.
>
> If you unanimously recommend a sentence of life without parole, the court will impose a sentence of *life imprisonment without parole.*

(Emphasis added.) Additionally, as the trial court instructed the jury regarding the Issues and Recommendation as to Punishment form, the trial court explained as to Issues Three and Four:

> If you unanimously find, beyond a reasonable doubt, that the mitigating circumstances found are insufficient to outweigh the aggravating circumstance or circumstances found, you would answer Issue number 3 yes.
>
> If you unanimously fail to so find, you would answer Issue number 3 no. If you answer Issue number 3 no, it would be your duty to recommend that the defendant be sentenced to life imprisonment without parole.
>
> . . . .
>
> If you answer Issue number 4 no, then you must recommend that the defendant be sentenced to life imprisonment without parole.

In addition to this instruction, the Issues and Recommendation as to Punishment form stated that the jury had a choice between "life imprisonment without parole" or "death." Accordingly, as the record reflects that the jury was repeatedly and clearly instructed that

defendant would either receive a sentence of death or life impris-
onment without parole, we conclude that the trial court did not err
in refusing defendant's requested instruction as to changes in the
parole laws.

**[23]** By this same assignment of error, defendant contends that the
trial court failed to correctly instruct the jury that a life sentence
means life without parole pursuant to N.C.G.S. § 15A-2002. Again, we
disagree. The trial court's instructions followed the pattern jury
instructions almost verbatim. *See* N.C.P.I.—Crim. 150.10. In address-
ing the jury, the trial court stated, "If you unanimously recommend a
sentence of life without parole, the court will impose a sentence of
life imprisonment without parole." This Court recently addressed
this identical argument and concluded that even though the better
practice would be to charge the jury by using the precise language
contained in N.C.G.S. § 15A-2002, the trial court did not err by read-
ing from the pattern jury instructions. *State v. Smith*, 351 N.C. 251,
270-71, 524 S.E.2d 28, 42 (2000).

**[24]** Defendant also argues under this assignment of error that the
trial court erred in preventing defense counsel from arguing to the
jury the changes in the parole laws. Additionally, defendant contends
that the trial court erroneously refused to allow defendant to argue
before the jury that there would be no parole in this case. Defendant's
arguments are without merit.

The following colloquy occurred during a motions proceeding:

[DEFENSE COUNSEL]: [W]e request . . . [t]hat you instruct the
jury, again, that life sentence means life without parole pursuant
to statute, and we intend to argue, unless the court instructs us
otherwise, that there is no parole. Life without parole means
without.

THE COURT: No, you're not going to get into that. You just
stated what it is. You're not going to get into whether or not
there's any parole board or anything of that. That's not evidence
before this jury at all. No evidence for that before the jury.

[DEFENSE COUNSEL]: Can we not argue that the law changed
in October?

THE COURT: No, sir. No, sir.

A decision regarding the substance of counsel's arguments is a
matter within the trial court's discretion. *State v. Bowman*, 349 N.C.

459, 473, 509 S.E.2d 428, 437 (1998), *cert. denied*, —— U.S. ——, 144 L. Ed. 2d 802 (1999). The record reflects that the trial court did permit defendant to argue that defendant should be sentenced to life imprisonment without parole, and thus defendant's argument to the contrary is without merit. During closing arguments, defense counsel asserted that life imprisonment did mean precisely life imprisonment without parole. Defense counsel argued:

> And you don't have to kill him, you're not required to. You don't have to, because when you get to that point in your soul, in your heart, you can say I've got another way to solve this problem, and it's to send him to prison for the rest of his natural life.
>
> . . . .
>
> You can bring closure to everybody in this case, and protect society if you decide that Patrick should spend the rest of his life in prison without parole.

Furthermore, as we have previously stated in this assignment of error, the jury was clearly made aware that life imprisonment meant life imprisonment without parole. Defendant has failed to show that the trial court abused its discretion by prohibiting defendant from making arguments concerning the abolition of the parole board or changes in the parole laws. This assignment of error is overruled.

[25] Defendant's next assignment of error addresses the trial court's failure to prevent the prosecutor from arguing defendant's future dangerousness during the penalty phase closing arguments. During this proceeding, defendant objected at two points to portions of the prosecutor's argument. In addition to those two portions of argument where defendant did object, defendant now also challenges the following underlined portions of the prosecutor's argument:

> He is a cold-blooded person. He is a heartless person. He is vicious. He has no sense of pity. He values money more than human life. He has no compassion. <u>He is very dangerous</u>. He has absolutely no conscience. He is savage. He has absolutely no sense of mercy. He is selective about who he assaults, and he is calculating clever, and cunning. He is a career criminal.
>
> . . . .
>
> Now, I want you to keep in mind that there are doctors, there are nurses, there are administrators, there are secretaries, there

are innocent people, innocent people just like Virginia Frost. Maybe not quite as old, but innocent nevertheless who work inside prisons every day, and the defendant there will have access to those people—

[DEFENSE COUNSEL]: Objection.

THE COURT: Overruled. Go ahead.

[PROSECUTOR]: And I ask you to keep in mind that there is no prison in North Carolina that is escape proof.

[DEFENSE COUNSEL]: Objection.

THE COURT: Objection is sustained. Members of the jury, don't consider that argument from the district attorney.

[PROSECUTOR]: I ask you ladies and gentlemen to recognize that the only way to protect his next victim from him is to find that the death penalty is the appropriate penalty.

At the conclusion of the State's argument, defendant's counsel addressed the trial court:

Very briefly, Your Honor. The defense would move for a mistrial with regard to the State's improper argument.

We have previously moved in limine to prevent the State to introduce evidence or offer or argue with regard to future dangerousness issues. It's not part of the aggravating circumstances statute, and the State has chosen to disregard that, and argue it anyway.

They argued it, we objected. Your Honor did sustain the objection, and direct the jury not to consider it. We move for a mistrial.

THE COURT: Motion denied.

Defendant concedes that this Court has held that the prosecutor may urge the jury to recommend death as a specific deterrent to a defendant committing another murder. *State v. Syriani*, 333 N.C. 350, 397, 428 S.E.2d 118, 144, *cert. denied*, 510 U.S. 948, 126 L. Ed. 2d 341 (1993). However, defendant argues that the case *sub judice* is distinguishable from this Court's previous holdings because those cases were decided prior to the elimination of parole in capital cases. Defendant also argues that the prosecutor improperly argued more

than ordinary future dangerousness by arguing that defendant could potentially harm prison personnel. We conclude these contentions are without merit.

In addressing the propriety of arguments in capital cases regarding issues of future dangerousness, this Court has analyzed the United States Supreme Court's decision in *Simmons v. South Carolina*, 512 U.S. 154, 129 L. Ed. 2d 133 (1994). *State v. Richmond*, 347 N.C. at 444-46, 495 S.E.2d at 695. This Court recognized that the Supreme Court in *Simmons* ruled:

> "The State may not create a false dilemma by advancing generalized arguments regarding the defendant's future dangerousness while, at the same time, preventing the jury from learning that the defendant never will be released on parole."

*Id.* at 445, 495 S.E.2d at 695 (quoting *Simmons*, 512 U.S. at 171, 129 L. Ed. 2d at 147). This Court also noted that the United States Supreme Court limited its analysis in *Simmons* to arguments concerning future dangerousness to the public at large. In this regard, this Court has stated:

> "Of course, the fact that a defendant is parole ineligible does not prevent the State from arguing that the defendant poses a future danger. The State is free to argue that the defendant will pose a danger to others in prison and that executing him is the only means of eliminating the threat to the safety of other inmates or prison staff."

*Id.* (quoting *Simmons*, 512 U.S. at 165 n.5, 129 L. Ed. 2d at 143 n.5). Accordingly, this Court concluded:

> The Court [in *Simmons*] thus sought to protect against prosecutorial arguments that [misled] jurors into believing that if they do not sentence a defendant to death, he will eventually be released from prison and once again be a threat to society. If a defendant would be imprisoned for life in the absence of a death sentence, then when the State makes such an argument, *Simmons* requires that the defendant be allowed to inform the jury of the nature of his life-without-parole sentence. If, on the other hand, the State refers to future dangerousness only in terms of dangerousness while incarcerated, the concerns of the Court in *Simmons* are not implicated.

*Id.* at 445, 495 S.E.2d at 695-96. This Court has therefore recognized that it is proper for the State to argue future dangerousness even though a defendant will never receive parole. *Id.*

More recently, the United States Supreme Court and this Court have held that it is permissible to argue the possibility of future dangerousness to prison staff and inmates. In *State v. Williams*, 350 N.C. 1, 510 S.E.2d 626, *cert. denied*, —— U.S.——, 145 L. Ed. 2d 162 (1999), a capital case where defendant would receive either a sentence of death or life imprisonment without parole, the prosecutor's sentencing argument referred to evidence concerning defendant's behavior while in jail. In upholding the State's argument this Court stated:

> When read in context, this prosecutor's argument focused on defendant's inability to adapt to prison life if given a life sentence. The prosecutor's argument also suggested that the death penalty would specifically deter defendant from committing future crimes. We have previously held that it is not improper for a prosecutor to urge the jury to recommend death out of concern for the future dangerousness of the defendant.

*Id.* at 28, 510 S.E.2d at 644. Based on the United States Supreme Court's decision in *Simmons*, as well as our decisions in *Richmond* and *Williams*, we conclude that the prosecutor's argument relating to defendant's potential for future dangerousness was proper.

[26] Under this same assignment of error, defendant argues that the trial court's brief curative instruction to disregard the State's improper argument that defendant may escape from prison was insufficient to ensure that the jury did not consider that argument in its deliberations. Defendant therefore contends that the trial court erred in refusing to declare a mistrial.

This Court has held that the decision " 'to grant a motion for mistrial is within the sound discretion of the trial court and its ruling will not be disturbed on appeal unless it is so clearly erroneous as to amount to a manifest abuse of discretion.' " *State v. Sanders*, 347 N.C. 587, 595, 496 S.E.2d 568, 573 (1998) (quoting *State v. McCarver*, 341 N.C. 364, 383, 462 S.E.2d 25, 35 (1995), *cert. denied*, 517 U.S. 1110, 134 L. Ed. 2d 482 (1996)). A trial court should declare a mistrial only " 'when there are such serious improprieties as would make it impossible to attain a fair and impartial verdict under the law.' " *State v. Norwood*, 344 N.C. 511, 537, 476 S.E.2d 349, 361 (1996) (quoting *State*

*v. Calloway*, 305 N.C. 747, 754, 291 S.E.2d 622, 627 (1982)), *cert. denied*, 520 U.S. 1158, 137 L. Ed. 2d 500 (1997).

Our review of the transcript reveals that the trial court sustained defendant's objection and then issued a curative instruction. "This Court presumes that jurors follow the trial court's instructions." *Norwood*, 344 N.C. at 537, 476 S.E.2d at 361. In the case *sub judice*, defendant has failed to show that the trial court's curative instruction was insufficient to erase any potential prejudice resulting from the comment, and thus the trial court did not abuse its discretion by denying defendant's motion for a mistrial. Furthermore, to the extent that defendant's motion for a mistrial also relates to the prosecutor's comments, to which defendant failed to object during the State's penalty phase argument, we note that we have already determined that the challenged comments relating to future dangerousness were proper. Accordingly, we conclude that the trial court did not abuse its discretion, and we overrule this assignment of error.

[27] In his final assignment of error, defendant contends that the trial court erred by allowing the prosecutor to argue the significance of the grand jury indictment during the guilt/innocence phase closing argument. Additionally, defendant argues that the trial court erred by refusing to give defendant's requested jury instruction, which would have cured this error. Defendant challenges the following portion of the State's closing argument:

Ladies and gentlemen, what you need to know is, that any date, on any indictment or any charge, is on or about. Meaning that, this crime occurred on or about this date. Even if there's one day placed down there, it's on or about that day. Meaning that an indictment says that it happened on or about that time; doesn't pin down an exact time. And if during the course of an investigation develop more information, you can go back to the grand jury and change the alleged date of offense.

But the police didn't just white out the original date, and pencil in a new date, neither did the district attorney's office. It took a grand jury, of eighteen citizens from the community, to listen to that evidence, and to agree. Yes, we're going to hand down a superseding indictment.

Yes, the evidence is there that this, on or about date, needs to be changed. And we, the grand jury, the people of this commu-

nity, say, yes, it needs to be changed. And the same thing for the other charge, that came out earlier this year.

The police just didn't dream up this charge. They didn't just write it and hand it to the defendant, nor did the district attorney's office. A grand jury was convened. They heard evidence, they decided; eighteen people just like yourselves. Yes, there's evidence to hand down an indictment on this charge. And they did so; they did so.

This isn't just the police just randomly charging. This is people from the community, listening to evidence, and deciding, yes, this charge is warranted. This isn't a haphazard investigation; it's a very careful investigation.

Defendant did not object at the time this argument was made. At the conclusion of the State's argument, the trial court advised the jury that the court would give its instructions to the jury the following morning. The next morning, defendant's counsel presented the following additional request for jury instructions:

[DEFENSE COUNSEL]: A grand jury indictment is no evidence of guilt. The defendant has no opportunity to confront or cross-examine the witnesses who appear before the grand jury. The grand jury only determining [sic] if there is probable cause to believe the crime has been committed, and if the defendant should be charged.

The standard of proof, to convince a grand jury to issue indictment, is not that required for conviction. The fact, that the defendant has been charged by a grand jury, is no evidence of, guilt whatsoever, and you may not consider that in your deliberations.

The following colloquy then ensued:

THE COURT: What gives rise to that issue?

[DEFENSE COUNSEL]: Your Honor, what gives rise is the argument of [the prosecutor], that a jury—

THE COURT: You folks brought up the business of the indictment in your arguments.

[DEFENSE COUNSEL]: Right. But he said that a jury has already heard this case, and made a decision to charge and—

THE COURT: Well, I'll tell them the fact he's charged with anything is no evidence of guilt, that—including all that. That's blanket instruction.

[DEFENSE COUNSEL]: Yes, sir.

THE COURT: The objection, and the request of the defense is noted, but denied. You can put it in the record.

Defendant did not bring his objection to the trial court's attention until the day after closing arguments concluded. Because defendant failed to object at the time the argument was made, this Court's review is limited to determining "whether the argument was so improper as to require the trial court's intervention *ex mero motu*." *State v. Atkins*, 349 N.C. 62, 84, 505 S.E.2d 97, 111 (1998), *cert. denied*, 526 U.S. 1147, 143 L. Ed. 2d 1036 (1999). A trial court is required to intervene *ex mero motu* only when "the argument strays so far from the bounds of propriety as to impede defendant's right to a fair trial." *Id.* We cannot conclude that the prosecutor's argument was improper because it was made in response to defendant's closing argument. Defendant's counsel stated during the guilt/innocence phase argument:

The significant thing about Ruth Steen's [defendant's mother] testimony, and you can use whatever tests you want to use in judging her credibility, is that at the time she was being questioned, that's the time that the police took the warrant out on Patrick. And the warrant's in evidence, and you can look at it. But the warrant alleges that Patrick committed this crime on Thursday the 29th of February, 1996.

The police were questioning her about her son's conduct on Thursday the 29th. And do you know what she told the police she remembered? She said, I can't tell you where he was Wednesday and Thursday after he left. There was some indication he'd been home the lights were out. But I can't tell you; I don't know.

Now if she's the kind of person who's trying to save her son or would lie for her son, then she would have been giving him an alibi to the police, on tape, for the 29th of February; and she didn't. She gave him up, if that was the date of the crime.

She told them the bad and the good. But as the investigation developed, the police learned about the crashing noise, they learned about the time of Mrs. Frost's death, and by March 12th,

when they got there on the 25th, when they got the indictments, they'd moved the date from Thursday to Tuesday. Make the facts fit so that we can deal with Mr. Steen. They'd already arrested him, they'd already charged him. Make the facts fit. We got one fiber in a TV, that's good enough. It's a red TV, that's good enough. That's not careful enough, it's not thoughtful enough, and it's wrong.

And then in January of 1998 they change it again to fit, make it fit, make Patrick Steen show where he was every single minute of every single day during that four day period.

Charge him with doing it sometime between the 26th and the 29th. And he can't do it; you couldn't do it.

. . . .

. . . You have to see whether or not all this physical evidence that the State talks about, all this fancy physical evidence, circumstantial evidence, is consistent with the crime being committed when it happened; that's the problem.

So what'd they do? They started with the 29th of February. They changed it to the 27th, then they changed it again between the 26th and the 29th, you know. All right.

The focus of the State's response to this argument was that neither the police nor the district attorney determined what date should appear on the original indictments or on the superceding indictments. Rather, the State explained that the grand jury handed down the indictments based on the evidence presented to it. We conclude that defendant's guilt/innocence phase closing argument regarding the dates on the various indictments opened the door to the State's closing argument regarding the grand jury's role in determining the alleged date of the offenses. *See State v. Gladden*, 315 N.C. 398, 423, 340 S.E.2d 673, 689, *cert. denied*, 479 U.S. 871, 93 L. Ed. 2d 166 (1986). Accordingly, we hold the prosecutor's comments were proper to refute defendant's attack on the procedure used in charging defendant, and the trial court was not required to intervene *ex mero motu*.

As to defendant's argument that the trial court erred in refusing to give defendant's requested jury instruction, we note that the trial court did instruct the jury that "[t]he fact that he's been charged or indicted is no evidence of guilt, whatsoever." This instruction, given

in the context of these closing arguments, was sufficient to eliminate any confusion or false impression the jury may have had in this regard. This assignment of error is overruled.

## PRESERVATION ISSUES

Defendant raises eight additional issues which he concedes have been previously decided contrary to his position by this Court: (1) the statutory short-form indictment insufficiently charged the elements of first-degree murder and failed to specify the aggravating circumstances upon which the State would rely;[1] (2) the trial court erred in its instruction that "the jurors had a duty to impose a death sentence upon answering Issues One, Two and Three in the affirmative"; (3) the trial court erred in submitting to the jury the (f)(1) statutory mitigating circumstance, no significant history of prior criminal activity, over defendant's objection; (4) the trial court erred in denying defendant's motion to prohibit the death penalty for failure of the State to initiate a Rule 24 hearing in a timely manner; (5) the trial court erred in denying defendant's motion to bar the death penalty on the grounds that prosecutorial discretion is arbitrary and capricious; (6) the trial court erred in denying defendant's motion to prohibit death-qualification of the jury; (7) the trial court erred in submitting to the jury the pecuniary gain aggravating circumstance, N.C.G.S. § 15A-2000(e)(6); and (8) the trial court erred in submitting to the jury the especially heinous, atrocious, or cruel aggravating circumstance, N.C.G.S. § 15A-2000(e)(9).

Defendant raises these issues for the purpose of permitting this Court to reexamine its prior holdings and also for the purpose of preserving them for possible further judicial review of this case. We have considered defendant's arguments on these issues and find no compelling reason to depart from our prior holdings. These assignments of error are overruled.

## PROPORTIONALITY REVIEW

[28] Having concluded that defendant's trial and capital sentencing proceeding were free from prejudicial error, we must now review the record and determine: (1) whether the evidence supports the aggravating circumstances found by the jury and upon which the sentencing court based its sentence of death; (2) whether the sentence was

---

1. In *State v. Braxton*, 352 N.C. 158, ——, —— S.E.2d ——, —— (2000), this Court reaffirmed its prior decisions that indictments for first-degree murder based on the short-form indictment statute, N.C.G.S. § 15-144, are in compliance with both the North Carolina and United States Constitutions.

entered under the influence of passion, prejudice or any other arbitrary factor; and (3) whether the sentence is "excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." N.C.G.S. § 15A-2000(d)(2). We have thoroughly reviewed the record, transcript and briefs in this case. We conclude that the record fully supports the aggravating circumstances found by the jury. Further, we find no indication that the sentence of death in this case was imposed under the influence of passion, prejudice or any other arbitrary factor. We therefore turn to our final statutory duty of proportionality review.

[29] In the present case, defendant was found guilty of first-degree murder under the theories of premeditation and deliberation and felony murder. He was also convicted of felonious breaking and entering and common law robbery. Following a capital sentencing proceeding, the jury found the two submitted aggravating circumstances: (i) the murder was committed for pecuniary gain, N.C.G.S. § 15A-2000(e)(6); and (ii) the murder was especially heinous, atrocious, or cruel, N.C.G.S. § 15A-2000(e)(9).

The trial court submitted four statutory mitigating circumstances to the jury, including the "catchall" statutory mitigating circumstance, N.C.G.S. § 15A-2000(f)(9). However, the jury found only one statutory mitigating circumstance, that the murder was committed while defendant was under the influence of a mental or emotional disturbance, N.C.G.S. § 15A-2000(f)(2). Of the nineteen nonstatutory mitigating circumstances submitted, the jury found seven to exist and to have mitigating value.

One purpose of our proportionality review is to "eliminate the possibility that a sentence of death was imposed by the action of an aberrant jury." *State v. Lee*, 335 N.C. at 294, 439 S.E.2d at 573. Another is to guard "against the capricious or random imposition of the death penalty." *State v. Barfield*, 298 N.C. 306, 354, 259 S.E.2d 510, 544 (1979), *cert. denied*, 448 U.S. 907, 65 L. Ed. 2d 1137 (1980). In conducting proportionality review, we compare the present case with other cases in which this Court has concluded that the death penalty was disproportionate. *State v. McCollum*, 334 N.C. 208, 240, 433 S.E.2d 144, 162 (1993), *cert. denied*, 512 U.S. 1254, 129 L. Ed. 2d 895 (1994). This Court has found the death penalty disproportionate in seven cases: *State v. Benson*, 323 N.C. 318, 372 S.E.2d 517 (1988); *State v. Stokes*, 319 N.C. 1, 352 S.E.2d 653 (1987); *State v. Rogers*, 316 N.C. 203, 341 S.E.2d 713 (1986), *overruled on other grounds by State v. Gaines*, 345 N.C. 647, 483 S.E.2d 396, *cert. denied*, 522 U.S. 900, 139

L. Ed. 2d 177 (1997), *and by State v. Vandiver*, 321 N.C. 570, 364 S.E.2d 373 (1988); *State v. Young*, 312 N.C. 669, 325 S.E.2d 181 (1985); *State v. Hill*, 311 N.C. 465, 319 S.E.2d 163 (1984); *State v. Bondurant*, 309 N.C. 674, 309 S.E.2d 170 (1983); and *State v. Jackson*, 309 N.C. 26, 305 S.E.2d 703 (1983).

We conclude that this case is not substantially similar to any case in which this Court has found the death penalty disproportionate. First, the jury convicted defendant under the theory of premeditation and deliberation. This Court has stated that "[t]he finding of premeditation and deliberation indicates a more cold-blooded and calculated crime." *State v. Artis*, 325 N.C. 278, 341, 384 S.E.2d 470, 506 (1989), *sentence vacated on other grounds*, 494 U.S. 1023, 108 L. Ed. 2d 604 (1990). Also, the murder in this case was committed in the victim's home. A murder occurring inside the home "shocks the conscience, not only because a life was senselessly taken, but because it was taken [at] an especially private place, one [where] a person has a right to feel secure." *State v. Brown*, 320 N.C. 179, 231, 358 S.E.2d 1, 34, *cert. denied*, 484 U.S. 970, 98 L. Ed. 2d 406 (1987), *quoted in State v. Adams*, 347 N.C. 48, 77, 490 S.E.2d 220, 236 (1997), *cert. denied*, 522 U.S. 1096, 139 L. Ed. 2d 878 (1998). Further, of the cases in which this Court has found the death penalty disproportionate, the jury found the especially heinous, atrocious, or cruel aggravating circumstance in only two cases. *State v. Stokes*, 319 N.C. 1, 352 S.E.2d 653; *State v. Bondurant*, 309 N.C. 674, 309 S.E.2d 170.

Neither *Stokes* nor *Bondurant* is similar to this case. As we have noted, defendant here was convicted of murder on the basis of premeditation and deliberation as well as under the felony murder rule. The defendant in *Stokes*, however, was convicted solely on the basis of the felony murder rule. In *Bondurant*, the defendant exhibited his remorse, as he "readily spoke with policemen at the hospital, confessing that he fired the shot which killed [the victim]." *Bondurant*, 309 N.C. at 694, 309 S.E.2d at 183. Defendant in the case *sub judice* "did not exhibit the kind of conduct we recognized as ameliorating in *Bondurant*." *State v. Flippen*, 349 N.C. 264, 278, 506 S.E.2d 702, 711 (1998), *cert. denied*, 526 U.S. 1135, 143 L. Ed. 2d 1015 (1999).

It is also proper for this Court to "compare this case with the cases in which we have found the death penalty to be proportionate." *State v. McCollum*, 334 N.C. at 244, 433 S.E.2d at 164. Although this Court reviews all of the cases in the pool when engaging in our duty of proportionality review, we have repeatedly stated that "we will not

undertake to discuss or cite all of those cases each time we carry out that duty." *Id.* It suffices to say here that we conclude that the present case is more similar to certain cases in which we have found the sentence of death proportionate than to those in which we have found the sentence of death disproportionate or to those in which juries have consistently returned recommendations of life imprisonment.

Finally, this Court has noted that similarity of cases is not the last word on the subject of proportionality. *State v. Daniels*, 337 N.C. at 287, 446 S.E.2d at 325. Similarity "merely serves as an initial point of inquiry." *Id.* Whether the death penalty is disproportionate "ultimately rest[s] upon the 'experienced judgments' of the members of this Court." *State v. Green*, 336 N.C. at 198, 443 S.E.2d at 47.

Based on the foregoing and the entire record in this case, we cannot conclude as a matter of law that the sentence of death was excessive or disproportionate. We hold that defendant received a fair trial and capital sentencing proceeding, free of prejudicial error.

NO ERROR.